## J. T. PERDUE, FOR USE, v. H. L. TAYLOR ET AL.

APPEAL BY M. SHAW, USE PLAINTIFF, FROM THE COURT OF COMMON PLEAS OF BUTLER COUNTY.

Argued October 19, 1891—Decided January 4, 1892.
[To be reported.]

(*a*) In an action of trespass, the testimony tended to show that the defendants, after obtaining negotiable oil certificates issued by the U. company, from the plaintiff, by means of a promise to give him in exchange other certificates issued by the P. company, to be indorsed by a responsible party, offered him certificates indorsed by an irresponsible party "without recourse," which he refused to accept.    The P. company was insolvent:

1. The facts exhibited such evidence of fraud as to make out a prima-facie case for the plaintiff, and it was therefore error to enter a judgment of compulsory nonsuit.    The plaintiff's claim being founded upon the proposition that he never lost his title to the property obtained from him by fraud, the facts would sustain either replevin, trover or trespass, and the remedy was not confined to assumpsit on the contract of exchange.*

2. An application for an amendment changing the form of action to assumpsit, made after the death of the original plaintiff whose deposition had previously been taken, and thirteen years after the action was commenced, was properly refused, it being inequitable, in view of the long delay, and of the fact that the mouths of the defendants were closed, to permit an amendment rendering the plaintiff's case easier to establish.

Before STERRETT, GREEN, McCOLLUM and MITCHELL, JJ.
No. 53 October Term 1891, Sup. Ct.; court below, No. 398 March Term 1877, C. P.

On March 1, 1877, John T. Perdue brought trover and con-

---

* See Duffield v. Rosenzweig, 144 Pa. 521.

version for three oil certificates, against H. L. Taylor & Co. On June 1, 1877, in obedience to a rule to plead, the defendants put in a plea of not guilty, and also a special plea. On December 5, 1878, there was placed on file an assignment of the cause of action to A. C. Gibson, who afterward, by assignment put on file August 26, 1890, transferred his interest in the cause to M. Shaw.

On September 12, 1890, the case being then on the list for trial at a special term commencing September 29th, Mr. Shaw filed a petition for an amendment changing the form of action from trover and conversion to trespass. The court made the order prayed for, directing that notice thereof " be given to the other side, the defendants to have the benefit of payment of costs up to that date, if placed at any disadvantage by reason of the change of form of action."

On September 29, 1890, the case was called for trial, when M. Shaw presented a petition praying that the order of September 12th be revoked, and that the form of action be changed by amendment to assumpsit, for the reason that the present plaintiff believed this to be necessary for the proper decision of the cause upon its merits. The court then made the following order:

" September 29, 1890, this motion presented to court, and same resisted by defendants, and it appearing that the plaintiff has been very negligent in bringing the case to trial, and the defendants, relying on the defence which they have to the case as it stands, would be at a disadvantage by granting this motion, it is refused."

The trial was then proceeded with, resulting in a verdict for the plaintiff for $19,019. Afterwards, the court on motion filed granted a new trial.

On January 5, 1891, the case was called for the second trial. The plaintiff's counsel then moved the court to amend the form of action by changing it from trespass to assumpsit.

By the court: Motion refused; exception.[1]

The jury having been sworn, the plaintiff produced testimony tending to establish the following facts:

John T. Perdue, the original plaintiff, died in October, 1887. In 1876, he was an oil producer, doing business at Petrolia, Butler county. He was the owner, on October 10, 1876, of three

Statement of Facts.

" oil certificates," for one thousand barrels of crude petroleum each, the oil being stored with the United Pipe Lines, a corporation engaged in the business of storing and transporting oil.* The value of the oil was then about $3.45 per barrel.   On the morning of October 10, 1876, he was approached by Joseph Wolcott, an oil broker, who had been sent to him for the purpose by H. L. Taylor, one of the defendants.   Wolcott asked him to exchange his three certificates for like certificates on the Pennsylvania Transportation Company, another pipe-line company doing business in Butler county.   Wolcott said to Perdue that he had a good responsible party who wanted to make such an exchange, and urged that it would probably be of some advantage to Perdue, as the pipeage was paid in the Transportation company.   Perdue replied that he could accommodate Wolcott, provided the party was sound and responsible, when Wolcott said again that his party was all right and perfectly responsible, adding that he wanted to use the certificates right away, and if Perdue would deliver them to him he would bring the Transportation company's certificates, signed by a responsible party, sometime during the day.   Perdue then delivered to Wolcott the three certificates first mentioned.   Before seeing Wolcott again, Perdue went to the office of the Transportation company and made inquiries which satisfied him that it was probably insolvent.   He had previously known that that company was not regarded as very good, and this was his rea-

* An " oil certificate " is usually somewhat similar in form to an accepted draft.   Producers deposit the oil, as it is produced, in the tanks of a pipe-line company, getting credit upon the company's books for the number of barrels of oil so deposited.   When the depositor wishes to sell his oil, he draws an order on the company, directing it to deliver to the purchaser the amount of oil specified therein.   Such orders are often presented at the office of the company by the person in whose favor they are drawn, for acceptance merely, whereupon the agent of the company writes across the face an acceptance, and thereafter the company holds the oil for the purpose of filling the order when afterwards presented for that purpose. When so accepted, the order is called an " acceptance " or a " certificate." By § 3, act of May 15, 1874, P. L. 172, certificates, etc., for petroleum, issued by corporations, etc., engaged in the business of transporting or storing petroleum, were made transferable by indorsement either in blank or to order, such indorsement to be deemed a valid transfer of the property represented by the certificates.   See, also, act of June 20, 1883, P. L. 127

Statement of Facts.

son for requiring that the person from whom he was to get the certificates should be good and responsible.

About noon of the same day, Wolcott came again to Perdue's office, and threw upon his desk three certificates or accepted orders, dated that day, drawn by H. L. Taylor & Co. on the Pennsylvania Transportation Company in favor of E. G. Taylor, cashier, for one thousand barrels each; accepted a short time before noon of the same day for the Transportation company, by E. F. Wilson, its agent, and indorsed in blank, "without recourse" by E. G. Taylor, cashier.* Perdue looked at them and at once said he would not accept them, as they were not signed according to contract, because the party signing them was not responsible, and also because of their being indorsed without recourse. The subsequent conversation was thus stated by Perdue in his deposition, taken a few months before his death :

"I then asked him who his principal was, and he said H. L. Taylor & Co. I threw them down and said to Wolcott that I would not accept them, and that it was all a fraud to rob me ; that they were not according to contract; that he had said and assured me that his principal was sound financially. I said to Wolcott that I would not accept them at all in any way or manner, signed as they were. He then asked time to see his party and see whether he could not make them (the certificates) all right. He went away, leaving the certificates on the table or desk, and returned in about ten minutes and said that I had got them in my hands and that the company would not do anything, but said that H. L. Taylor was away or out, and when he returned he would see him personally. Wolcott came to me again in the afternoon and said that he had seen Taylor and that Taylor said he would see me about the matter. . . . .

"I did not see H. L. Taylor until probably ten days after the said tenth day of October, and delayed the matter, think-

---

* When offered in evidence at the trial, each of these certificates bore the indorsement in blank of John T. Perdue, canceled by drawing a pen through his signature. The assignment of the cause of action made by Perdue to Gibson, referred to supra, embraced also by specific mention, all Perdue's right, title and interest in these certificates. That assignment was put in evidence by the plaintiff.

ing that possibly H. L. Taylor & Co. would do what was right; but as I have said, they did not see me as was promised by Wolcott. On the other hand, H. L. Taylor appeared to dodge me on the street, and acted as though he did not want to see me. About ten days after the tenth of October, 1876, I went to the office of H. L. Taylor & Co., taking a witness with me, and tendered to H. L. Taylor, of said firm, defendants, the certificates Wolcott had left in my office, and demanded certificates as called for by the contract with said firm. In reply, Taylor said when he made a contract he lived to it, and he would make me live to mine. I told him I had never accepted the certificates in exchange at all, in any way or manner; that he (Taylor) knew it was a fraud and not according to the contract. He would not accept or take the certificates so tendered, and refused to make the same right.

" A few days after the above conversation with H. L. Taylor I met on the train between Kittanning and Petrolia Mr. E. G. Taylor, who had signed or indorsed said certificates, and he said to me not to say anything more about it; that he had that day seen the superintendent of the said Pennsylvania Transportation Company, and that the superintendent would be in Petrolia that day or night and would make it all right with me. A short time after October 10, 1876, (the exact date I cannot tell,) I had a conversation with Wolcott, the agent of H. L. Taylor & Co., and I asked him what interest he had in the transaction, and he said that he had no interest in the matter except a brokerage fee; that H. L. Taylor & Co. received the principal. Also, in a conversation I had with Wolcott after the transaction on October 10, 1876, he admitted to me that I had objected to the certificates tendered and refused to accept them, as they were not according to the contract, and that I said E. G. Taylor was irresponsible, and further said that the whole transaction, so far as the attempt to palm off on me said certificates so signed by E. G. Taylor, was a fraud and an attempt to rob me."

Other testimony for the plaintiff tended to show that the Pennsylvania Transportation Company kept its account with the banking house of H. L. Taylor & Co.; that, on and about October 26, 1876, this account was largely overdrawn; that on October 10th and for some time prior thereto, there were out-

standing acceptances and certificates issued by the Transportation company for at least one hundred thousand barrels of oil in excess of what was in its lines, and it was utterly insolvent; that on October 26th the sheriff closed its business, and afterwards a receiver was appointed to take charge of the same, by whom it was ascertained that the total over-issue of certificates down to October 26th, amounted to three hundred and twenty-five thousand barrels. Its obligations amounted to nearly one million dollars in excess of its assets.

Charles D. Brower, who was a clerk in the company's office, testified as follows: "Q. What is your best recollection as to the amount of oil that Mr. Taylor had in the line for the issuing of those certificates? A. My recollection is that he did not have the oil." . . . . .

Cross-examination: "Q. How do you know that Taylor & Co. did not have the oil in the line? A. I say I don't know. My recollection is that they did not have, that is all. Q. May they not have had twice that quantity of oil for anything that you know? A. I know nothing about it. I am merely stating to the best of my recollection that they did not have. Q. Don't you know that they had wells connected with the line in the Millerstown district? A. I don't recollect of but one well they had on the line that we ever got any oil from. Q. Don't you know that they were running oil from that well into the line down to the close of the business of the company? A. They might have been, just the one well. That is the only one that I recollect of their having on the line."

At the close of the plaintiff's case the defendants made the following motion:

And now, to wit, January 6, 1891, the plaintiff having closed his evidence, the defendants, by their counsel, move the court for a compulsory nonsuit, for the following reasons:

1. It appears by the plaintiff's own testimony that he parted with his property upon the agreement of the defendants that they would thereafter bring to him three Pennsylvania Transportation Company certificates for one thousand barrels of oil each, signed by a good, responsible party, and upon the representation of the defendants that they were responsible; and this with knowledge that the Pennsylvania Transportation Company was not regarded as good.

Motoin for Nonsuit.

2. It appears by the plaintiff's testimony, that the defendants did thereafter deliver to him three Pennsylvania Transportation Company certificates for one thousand barrels of oil each, signed by them, the said defendants; it appears by his indorsement thereon, and assignment thereof to A. C. Gibson, and the production thereof in court, that he, the said plaintiff, accepted the said certificates and held the same; and it further appears by the plaintiff's averment in his declaration, that the defendants were responsible.

3. There is no evidence of any misrepresentation or fraud practiced by the defendants, and fraud cannot be presumed but must be proved.

4. Consequently, the plaintiff cannot recover in this form of action; the only remedy, if any, being upon the responsibility of the defendants as drawers of the orders upon the transportation company, called "certificates," in which case it would be incumbent upon the plaintiff to show reasonable diligence in presenting the orders for delivery of the oil therein specified, or, if the orders so delivered were not in accordance with the contract proved, and for that reason not accepted, then upon the contract for the breach thereof.

5. The evidence shows that the title to the three said certificates is now vested by the assignment of John T. Perdue in A. C. Gibson, and it is therefore not in the power of either the legal or equitable plaintiff to return them to the defendants, and hence they are not able to rescind the contract.

By the court, HAZEN, P. J.: This motion is broad, and some of the reasons, if standing alone, probably this court would not sustain. Whether the transaction between the plaintiff, J. T. Perdue, and the defendants, H. L. Taylor & Co., on the tenth day of October, 1876, was wise or not, is not in question; that it proved, thus far, unfortunate for the plaintiff, seems to be clear, but sympathy has nothing to do with enforcing a contract.

The motion is sustained and compulsory nonsuit entered.

—A rule to take off the nonsuit having been discharged, exception,[2] the plaintiff took this appeal, specifying that the court erred:

1. In refusing plaintiff's motion to amend.[1]

2. In entering and refusing to take off the compulsory nonsuit.[2]

Arguments.

*Mr. John M. Greer* and *Mr. J. W. Lee* (with them *Mr. Everett Ralston*), for the appellant:

1. The present plaintiff is not responsible for the form of the action. When he became thoroughly acquainted with the facts, he desired to change the form of action so that he might have broader ground, without at all changing the cause of action. If the fourth reason assigned in support of the motion for a compulsory nonsuit was correct, the change desired by the plaintiff was necessary for a proper decision of the cause upon its merits, and it was the duty of the court to allow the amendment : § 1, act of May 10, 1871, P. L. 265 ; Rodrigue v. Curcier, 15 S. & R. 81; Erie City I. Works v. Barber, 118 Pa. 17. As there was no intention to forsake the original cause of action, the statute of limitations was not a bar : Smith v. Bellows, 77 Pa. 447. The fact that there had already been one amendment of the form of action was no reason for refusing a further change : Collins v. Barnes, 130 Pa. 356. And the delay in bringing the case to trial, referred to by the court below, was as much the fault of the defendants as of the plaintiff.

2. It was certainly a mistake to enter a nonsuit after proof of the facts shown by the plaintiff. If Perdue delivered his property to Taylor, in exchange for other certificates which were fraudulent and worthless, or represented oil not owned by Taylor nor in the Pennsylvania Transportation Company's line, his title to the property so delivered was not divested, and the action of trover can be maintained : Green v. Humphry, 50 Pa. 212 ; Harner v. Fisher, 58 Pa. 453 ; Mackinley v. McGregor, 3 Wh. 369 ; Bush v. Bender, 113 Pa. 94 ; Barker v. Dinsmore, 72 Pa. 427 ; Waters v. Van Winkle, 2 Pen. 567 (4 Am. Dec. 387). The statutory action of trespass includes trover, and the case was upon trial as if for trover or deceit. The plaintiff was therefore entitled to the full width of the road. And the question whether the transaction was fraudulent was for the jury, who might infer fraud as a conclusion drawn from all the circumstances of the case : Bradgeu v. Walker, 2 H. & J. 280 ; Woods v. Gummert, 67 Pa. 136 ; Angier v. Angier, 63 Pa. 450 ; Reinhard v. Keenbartz, 6 W. 93.

*Mr. C. Heydrick* (with him *Mr. T. C. Campbell* and *Mr. Clarence Walker*), for the appellees :

Arguments.

As to the right of amendment, counsel cited : Kaul v. Lawrence, 73 Pa. 410 ; Miller v. Bealer, 100 Pa. 583 ; Leeds v. Lockwood, 84 Pa. 70 ; Trego v. Lewis, 58 Pa. 463 ; Tyrrill v. Lamb, 96 Pa. 464 ; First N. Bank v. Shoemaker, 117 Pa. 94 ; Smith v. Smith, 45 Pa. 403 ; Wood v. Anderson, 25 Pa. 407 ; Shock v. McChesney, 4 Y. 507 ; Root v. O'Neil, 24 Pa. 326 ; McNair v. Compton, 35 Pa. 23 ; Gardner v. Post, 43 Pa. 19 ; Beates v. Retallick, 23 Pa. 288 ; Schoneman v. Fegley, 7 Pa. 433 ; Fairchild v. Dunbar Fur. Co., 128 Pa. 485.

1. In an action for fraudulently inducing the plaintiff to purchase personal property by false and fraudulent representations, it must be shown that the representations were untrue, were known to be so by the defendant and were calculated to induce the plaintiff to act, and that he, believing them, was induced to act accordingly : Cox v. Highley, 100 Pa. 249. There is no evidence that Wolcott represented that his principals had oil in the Pennsylvania Transportation Company's line, but if such a representation can be implied, there is no sufficient evidence that it was untrue. To sustain such an action as this, there must be more than a mere scintilla ; fraud must be clearly proved : Mead v. Conroe, 113 Pa. 220. The certificates themselves, offered in evidence by the plaintiff, were some proof that Taylor & Co. had deposited the oil in the line, and there is no evidence to contradict them, unless it be the testimony of Brower, which is not sufficiently clear and reliable.

2. There is no evidence that any representation was made expressly as to the Transportation company's solvency. Nor can such representation be implied ; a vendor is not bound to disclose his knowledge when the means of information are equally open to the vendee : Kintzing v. McElrath, 5 Pa. 467 ; Croyle v. Moses, 90 Pa. 250. But if there was either an express or an implied representation as to solvency, it must be shown that the defendants knew of the insolvency : Duff v. Williams, 85 Pa. 490 ; McCandless v. Young, 96 Pa. 289. This is not shown. Moreover, Perdue was not deceived on that subject, as he knew or suspected insolvency on October 10, 1876. And the claim that the Transportation company's certificates were to be guaranteed or warranted by the defendants, is not supported by Perdue's testimony. He says simply that they were to be signed by a good and responsible party. When produced on

Opinion of the Court.

the trial, it appeared that they were signed by H. L. Taylor & Co., who were admittedly good and financially responsible.

3. Even, however, if the certificates, when delivered to Perdue, had not been signed as Wolcott agreed they should be, or if they had not been delivered at all, there would have been nothing more than a breach of contract, for which assumpsit, but not trespass, could be maintained. On the testimony, the delivery of the United Pipe Lines certificates to Wolcott for immediate use, was not a conditional sale, but the title was to pass at once. On failure to deliver the consideration, the relation of the parties would be simply that of debtor and creditor, and the remedy would be upon the contract, not by an action for tort: Duffield v. Miller, 92 Pa. 286 ; Taylor v. Saurman, 110 Pa. 3 ; Borland v. Stokes, 120 Pa. 278 ; Logan v. Smith, 8 W. N. 102. Moreover, the plaintiff has shown an acceptance of the Transportation company's certificates. When produced at the trial they bore the indorsement of Perdue, showing that he had used them for some purpose. The drawing of a pen through his signature was doubtless done when it was found necessary to use them in evidence. Again, he specifically assigned these identical certificates to A. C. Gibson.

OPINION, MR. JUSTICE GREEN :

A judgment of compulsory nonsuit having been entered at the close of the plaintiff's testimony, the truth of all the facts proved, and all legitimate inferences therefrom, must be assumed in favor of the plaintiff. The fact that Wolcott was the agent of the defendants in procuring the certificates from the plaintiff is one of these, and the liability of the defendants for the acts and declarations of their agent in the course of the transaction is a necessary legal inference. Another leading and very serious fact, entirely without question, is, that the defendants, by means of, and in consequence of, the acts and declarations of their authorized agent, obtained from the plaintiff certificates for three thousand barrels of oil of the actual cash value of over ten thousand dollars, for which they gave him nothing having any value, and, as he alleges and testifies, nothing which he ever agreed to accept. The certificates which the defendants offered to the plaintiff were absolutely and utterly worthless, and it is an inference which a jury would be perfectly at liberty

to draw, from all the facts of the transaction, that the defend-
ants knew their worthless character when they tendered them
to the plaintiff.  Moreover, it was positively testified by the
plaintiff, and must be assumed as verity, that the plaintiff only
agreed to part with his good certificates upon condition that he
should have the name and responsibility of parties who were
perfectly good in a financial sense, in addition to the certificates
he was to receive in exchange.  It is equally true that the cer-
tificates which were offered to him had not a penny of value
in themselves, and that no name and no responsibility to which
he could have recourse was furnished to him in the manner in
which the defendants undertook to perform their part of the
contract.  It is also positively testified by the plaintiff, and
must be assumed as verity, that at the very moment when the
certificates tendered by the defendants to the plaintiff were
seen by the plaintiff, he peremptorily refused to receive them,
and denounced the transaction as a fraud contrived to rob him
of his certificates.  It is also a perfectly established fact that,
although his refusal to receive the certificates of the defendants
was immediately communicated to the defendants, they utterly
refused to return the plaintiff's good certificates to him, or to
give him any value for them, or to give him a particle of secu-
rity, or to indemnify him in any way whatever.  They evaded
him, and gave him some vague promises which they never per-
formed, but that was all; and the plaintiff's loss of over ten
thousand dollars, and the defendants' acquisition of his property
of that value, without their giving him any equivalent of any
value at all, became an accomplished fact, for which no redress
has as yet been obtained.

But there was another fact equally as well established with
the rest, which gives a peculiar and especial character to the
transaction well worthy of notice.  It is this: The plaintiff was
induced to part with his certificates to the defendants, in ad-
vance of any delivery by them, and without anything to show
for them except the verbal promise of the defendants by their
agent to deliver the certificates of the Transportation company,
with the name and responsibility of a party perfectly sound
and good.  The thing was done by the defendants' agent, and
therefore it was their act; but even the name of the principal
was not disclosed at that stage of the transaction.  It was, of

Opinion of the Court.

course, a very unwise act on the part of the plaintiff, but there was thereby added to the mere legal obligation of the defendants an obligation of honor which, we are glad to believe, the great majority of the business community would be keenly anxious to observe. The defendants had been intrusted with the possession of the plaintiff's certificates. That possession was obtained in this way: The defendants' agent represented to the plaintiff that his principals were anxious to use the certificates "right away," and if the plaintiff would deliver them to him, he would bring him the other certificates later on during the day. The plaintiff then delivered his certificates to the agent, and that was the last he ever saw of them. When he demanded them back, with an indignant protest, he was refused them. It may be possible that the pretext upon which the possession of the plaintiff's certificates was obtained was real and consistent with honor, but it was pre-eminently the function of a jury to determine whether it was not a false and dishonorable pretence, and part of a scheme of fraud devised to cheat the plaintiff out of his valuable securities. Upon the facts as they now appear, it was the plain duty of the defendants, either to return the securities the moment they were demanded, or else to give to the plaintiff some equivalent for them which he was entirely willing to receive.

It is perhaps unnecessary to discuss the facts of the case any further. We are clearly of opinion that it was grave error to withdraw them from the consideration and decision of the jury. They raised in a very forcible and emphatic manner a question of fraud in fact, which the court had no right to decide but was bound to commit to the jury. It was not by any means a case in which the proof was only a scintilla. On the contrary, it is difficult to understand, upon the testimony as it now stands, and upon the prominent leading facts of the case, how it is possible to explain the transaction on behalf of the defendants, consistently with any regard for business integrity or common honesty. It cannot be believed that, if the defendants' agent had offered to the plaintiff, at the time he proposed the exchange, the same certificates and in the same condition in which they were when he really did offer them, the plaintiff would even have considered the subject of an exchange, much less agreed to it. We are not informed of the reasons why the

Opinion of the Court.

first verdict for the plaintiff for nineteen thousand dollars was set aside. The only reason given by the court below for granting the compulsory nonsuit, was that it was not a question whether the transaction was wise or not on the part of the plaintiff, and that sympathy has nothing to do with enforcing a contract. This view is very far short of an adequate treatment of the case. The palpable facts, as we regard them, present a question, not of the enforcement of a contract, but of the procurement by the defendants from the plaintiff of his very valuable securities by means of a base fraud. If such a fraud was practiced, and the securities of the plaintiff were obtained by means thereof, the transaction was utterly void from the beginning, the plaintiff never lost his title to his certificates, and he is entitled to have them back, or their value with interest. It is not a matter of much consequence whether the remedy invoked is replevin, trover, trespass, or assumpsit; since the claim of the plaintiff is founded upon the proposition that he never lost his title to the property obtained from him by fraud, and any well-known remedy applicable to the recovery of personal chattels or their value, the right to which is in the plaintiff, and the possession of which is unlawfully in the defendant, is available to that end.

With reference to the proposed amendment, we think that, in view of the fact of the very long delay in making the application, and of the fact that the defendants' mouths are closed by the death of the plaintiff, and that the allegation of fraud is more difficult to make out than the mere liability upon a failure of consideration, it would not be equitable to permit the plaintiff to gain an advantage by the pleadings which he did not have before the application was made, and we therefore decline to sustain the first assignment of error.

Judgment reversed, and new venire awarded.