West Penn Power Company, et al., Appellants, *v.*
Bethlehem Steel Corporation.

414

Argued April 8, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, VAN DER VOORT, and SPAETH, JJ. (PRICE, J., absent).

*David J. Armstrong,* with him *Richard S. Dorfzaun, Charles W. Kenrick, John Dickey,* and *Dickie, McCamey & Chilcote,* and *Sullivan & Cromwell,* for appellants.

*William B. Mallin,* with him *Milton W. Lamproplos, Willis A. Siegfried, Jr., G. Robert Moore, David M. Beckwith,* and *Eckert, Seamans, Cherin & Mellott,* for appellee.

OPINION BY SPAETH, J., September 22, 1975:

This is an appeal from the refusal of a court *en banc* to remove a compulsory nonsuit and to grant a new trial.[1] Appellants brought this action to recover about $7,000,000 as consequential damages for appellee's alleged breach of contract. Because of the scope of the case (appellants' evidence took eight weeks to present; the transcript is about 7,000 pages; and many issues have been briefed and argued that we do not find it necessary to discuss), we shall first state, in a general way, the background of the contract, adding later such facts as needed.[2]

---

1. We shall discuss only the refusal to remove the nonsuit. The reasons assigned for a new trial may be found in the opinion of the lower court. Without deciding whether there was trial error, it is sufficient to note that these reasons do not go to the propriety of the nonsuit.

2. As appellants correctly note, in considering whether a nonsuit was properly entered we must give the plaintiff the benefit of the evidence, resolving all doubts in his favor, and affirm only in a clear case, where there is no doubt as to the inferences to be drawn from the evidence. *See generally* 6 Standard Pa. Practice 372 (1960). As will appear, however, we find that the case turns not upon how the various witnesses' testimony might be interpreted, but rather upon issues of law.

*General Background*

Appellants are three public utilities engaged in producing and distributing electricity in Southwestern Pennsylvania. For certain purposes they form an entity called the Allegheny Power System (APS), although they have brought this action as individual corporations. In 1962, APS started planning an Extra High Voltage Power Generation and Distribution System (EHV system). Power companies on the east coast did the same, the intention being that the several companies' systems should be combined into a total system known as the "grid". APS's system included a generating station, a substation, and a system of power lines; the date set for completion was May 1, 1967. We are concerned with one part of the power lines systems, specifically, that comprising the 500 KV power lines. This is in four segments, totalling about 180 miles and supported by 758[3] steel towers.

In 1963, APS retained Sargent & Lundy, a consulting engineering firm, to design the power line system, including the towers, and to provide construction engineering and scheduling. This was an extremely complicated job, for although standard sizes and shapes of structural steel were to be used in all of the towers, differences of terrain, changes in direction, and variations in the distance between the towers, all involving attendant differences in stress, height, etc., required that each tower be virtually custom designed. In August, 1964, Sargent & Lundy invited five large steel manufacturing and fabricating companies to submit bids for the sale of steel to be used in the power line system. Appellee was chosen to supply the steel for the 500 KV part of the system, apparently because APS understood that appellee could

---

3. Appellants' brief gives the number as 763, appellee's as 755. It is not important which number is correct, and we shall use the court *en banc's* number.

provide the steel on a faster schedule, albeit at a higher price. A division of United States Steel was chosen to supply the steel for the lower voltage part of the system. APS invited bids from construction contractors in January, 1965, and chose Electrical Contractors, which had bid the job on a unit price basis, *i.e.*, payment to be made on each completed tower. The general relationships thus established were that appellee was to fabricate and ship steel parts of the types and quantities requested to the destinations indicated by Sargent & Lundy, for use by Electrical Contractors, which was to establish receiving yards, preferably with railroad sidings.

Work began in March, 1965. Appellants do not concede that appellee was faithful to whatever commitment existed at any stage of the project. Nevertheless, construction proceeded. The contract between APS and Electrical Contractors contemplated that the line would be built on a 40-hour week, but that APS would reimburse Electrical Contractors for overtime payments if agreed to in advance. Apparently the men who work on this type of project tend to be transient, and in late summer of 1965, Electrical Contractors informed APS that it would have to offer more overtime in order to induce men to work on the line. This authorization was given on December 7, 1965. At the end of 1965, appellants transferred about 20% of the tower steel order from appellee to Creamer & Dunlop. This was apparently done by mutual consent; appellants claim it was necessitated by appellee's poor performance with respect to deliveries.

In the summer of 1966, Electrical Contractors informed APS that because of delays in the work, it was no longer willing to continue on the unit price basis. It blamed these delays on the failure of APS to provide timely access to right of way for the lines and also on a lack of steel. In order to keep Electrical Contractors

on the job, which appellants claim was vital in order to finish the line on time, the construction contract was renegotiated on November 21, 1966, to change the computation of compensation to a cost plus fixed fee basis retroactive to the beginning of the project (*i.e.*, back about eighteen months). No demand was made on Electrical Contractors' bonding company, APS's theory being that Electrical Contractors was not to be blamed for the delays. In January, 1967, in another move to expedite the work, appellant West Penn Power Company contracted with the construction firm of Day & Zimmerman for the completion of one part of the line. This contract also provided for payment on a cost plus fixed fee basis.

The line was completed by July, 1967. Although this was about two months later than originally planned, it was possible to place the line in commercial service on schedule by shortening the testing period. This suit was brought on November 18, 1968.[4]

---

4. Prior to filing suit, appellants made private audits of Electrical Contractors' and Day and Zimmerman's expenditures. This was not to determine whether Electrical Contractors' claim that it could not afford to continue under the unit price contract was actually attributable to a lack of steel, but was to check for overcharging. Appellee had not been informed of the change in the contract between APS and Electrical Contractors; further, when deliveries were completed there was a settlement between appellants and appellee for steel delivered less misfabricated pieces, with no mention of a claim for cost overrun. Appellee has argued, and the court *en banc* held, that this failure to give appellee notice "that it would be held responsible for the cost overrun on the job is a fatal defect in [appellants'] case . . ." Appellants have replied that the evidence "was sufficient to let [appellee] know that its delivery performance was troublesome and had to be watched." In our view, it is not necessary to consider this issue. A comparable issue, which we also do not find it necessary to consider, is whether appellants proved that whatever damages they did suffer were attributable to appellee.

Stating appellants' three separate claims as one, the damages claimed may be summarized as follows:

| | |
|---|---:|
| (a) Additional costs resulting from the change in the manner of compensation for Electrical Contractors from fixed unit price to cost plus fixed fee, plus cost of adding Day & Zimmerman to the project ............... | $6,672,647.63 |
| (b) Purchase of additional line stringing equipment to make up for lost time ...................... | 24,611.84 |
| (c) Difference between the price paid to Creamer & Dunlop for steel it supplied and the price that would have been paid to appellee ........... | 46,032.64 |
| (d) Cost of the audits ........... | 25,809.61 |
| Total ...................... | $6,769,101.72 |

As is evident these figures reflect the theory that appellee should pay so much of the cost of the work on the power line as exceeded the cost that would have accrued if Electrical Contractors had performed in accordance with its original contract and had been paid on a unit price basis. While the size of the figures is of no legal significance, it does give some indication of the factual complexity of this litigation—a consideration that will become important later, in our discussion of the motion to amend the complaint.

### The Contract as Pleaded in the Complaint

Paragraph 5 of the complaint reads as follows:

"5. On or before December 21, 1964, plaintiffs and defendant concluded contractual arrangements by the terms of which defendant undertook to detail, fabricate, galvanize and deliver to plaintiffs, in accordance with Specification Y-1756, dated May 19, 1964 [Exhibits 1 and 2], revised for purchase Order October 12, 1964, and Summaries of Proposal Y-1756-A (to West Penn), Y-1756-B (to Mononga-

hela) and Y-1756-C (to Potomac Edison) [Exhibits 5-7], structural steel . . . for steel transmission towers to be used by plaintiffs in the erection of 500 KV transmission lines in Pennsylvania, West Virginia and Maryland. Copies of the following writings which compose, indicate or confirm the contracts are annexed hereto and made a part hereof. . . ."

Paragraph 6 of the complaint pleads that the steel for the towers was to be delivered according to certain schedules, and sets out one schedule of deliveries to appellant West Penn, another to appellant Monongahela, and a third to appellant Potomac Edison. Paragraph 7 of the complaint pleads that appellee "expressly represented and agreed, both in the contracts and otherwise," that it could and would deliver the steel "in accordance with the foregoing delivery schedules and in proper sequence to permit continuous erection of the transmission lines." Paragraph 8 of the complaint pleads that appellee knew that its failure to make such delivery would result in damages to appellants. There then follow three separate counts: the first pleads West Penn's damages, the second, Monongahela's and the third, Potomac Edison's.

As one examines these allegations, one is struck by two facts. The first is that no writing is identified as embodying the "contractual arrangements" alleged to have been "concluded" "[o]n or before December 21, 1964;" and the second, which is consequent upon the first, is that in order to understand what was the relationship between the parties, it will be necessary to scrutinize their written communications, attached to the complaint as exhibits.

*The Written Communications*
*Between the Parties*

About August 17, 1964, a set of bid documents [Exhibit 1] with instructions and specifications [Exhibit 2]

was sent by APS to various steel companies, including appellee. These documents invited appellee to submit a price per unit quotation for the fabrication and supply of the various pieces of steel that would be needed for the towers. Estimates of the required number of each type of piece (so many legs, so many anchors, so many templates, etc,) were included, as was a shipment schedule, calling for shipments to start on March 15, 1965, and to be completed by October 1, 1965. The bid documents also contained the following provision: "15. Bidder shall state in his proposal whether he can meet the shipping dates listed and will be required to furnish proof of his ability to do so."

Appellee responded with a proposal dated September 15, 1964 [Exhibit 3],[5] stating that it could meet the required shipment schedule. Included in the proposal, however, was a standard printed form, signed by J. E. Campbell of appellee's Chicago office. The form contained the following clause in conspicuous type directly above Mr. Campbell's signature:

> "ACCEPTANCE: Should you desire to enter into a contract on the terms and conditions set forth above, please so indicate by signing and returning to us within . . . -7- . . . [typewritten insertion] days from the date hereof, the original and one copy of this quotation *which shall become a contract upon, but not before, acceptance by the Home Office of our company at Bethlehem, Pa.* Upon such acceptance a duly executed counterpart will be returned to you." (Emphasis added.)

On October 8, 1964, representatives of appellants, appellee, and Sargent & Lundy met to discuss appellee's proposal. Testimony by Mr. Hoffman of APS and Mr. Arena of Sargent & Lundy indicates that Mr. Steele of

---

5. As will appear, this proposal was modified by two letters. For convenience, therefore, it will be referred to as Exhibit 3a, and the letters will be referred to as Exhibits 3b and 3c.

appellee's home office said at this meeting that because of another power line contract, appellee could no longer propose to ship the steel according to the schedule called for in the bid documents (*i.e.*, March 15, 1965, to October 1, 1965), but that shipments could start March 1, 1965, and be completed by the second quarter of 1966, shipment to be made at the rate of about 800 tons/month. This proposal by Mr. Steele was to remain in effect for fourteen days (*i.e.*, until October 22, 1964). In any case, the next writing [Exhibit 3b] is a letter from appellee's Chicago office dated October 9, 1964. This refers to appellee's proposal of September 15 [Exhibit 3a], and modifies it in a way not relevant here. The final sentence of the letter states: "All other terms and conditions of our proposal A-44519—M-9376, dated September 15, 1964 [Exhibit 3a], remain unchanged." The letter is signed by Mr. Campbell, who had also been present at the meeting on October 8. Mr. Campbell sent another letter to appellants on October 12 [Exhibit 3c] in which he confirms the contents of a telephone call with Mr. Arena on October 9. Four more modifications in the proposal of September 15 are noted, none of them having anything to do with the shipment schedule. The final sentence of this letter states: "All other items and conditions of our Proposal A-44519—M-9376, dated September 15, 1964 [Exhibit 3a], and letter of October 9, 1964 [Exhibit 3b], remain unchanged."

On October 22, 1964, APS sent a letter [Exhibit 4] to appellee's Chicago office, informing appellee that it had been chosen to supply the steel for the 500 KV towers and that purchase orders for the steel would be forthcoming. The letter incorporates by reference the original bid documents [Exhibits 1 & 2], appellee's proposal [Exhibit 3a], and the two letters from Mr. Cambell modifying appellee's proposal [Exhibits 3b and 3a].

Sometime before November 30, 1964, appellee sent a proposal to each appellant; in effect, appellee divided

its proposal of September 15 [Exhibit 3a] as modified [Exhibits 3b and 3c] into three, one for each appellant [Exhibits 5 (West Penn), 6 (Monongahela), and 7 (Potomac Edison)]; each of the three proposals was marked at the end, "Revised for Purchase Order October 22, 1964." It is these three proposals that contain the shipment schedules pleaded in paragraph six of the complaint, as follows:

Schedule of Deliveries to West Penn

(i) Shipments of steel to start arriving at storage points on March 15, 1965.

(ii) Shipment of 80% of anchors and bottom panels to be completed by June 15, 1965.

(iii) Shipment of 100% of anchors and bottom panels to be completed by February 1, 1966.

(iv) Shipment of 80% of tower bodies to start April 15, 1965 and to end October 30, 1965.

(v) Remainder of tower bodies to be delivered by March 1, 1966.

Schedule of Deliveries to Monongahela

(i) Shipments to start arriving at storage points on March 15, 1965.

(ii) Shipment of 30% of anchors and bottom panels to be completed by June 15, 1965.

(iii) Shipment of 100% of anchors and bottom panels to be completed by May 1, 1966.

(iv) Shipment of 100% of tower bodies to start April 15, 1965 and to end April 1, 1966.

Schedule of Deliveries to Potomac Edison

Same as to Monongahela.

Each of these three proposals was accompanied by the same printed form that had accompanied appellee's proposal of September 14 [Exhibit 3a], including the same "Acceptance" clause calling for final approval by appellee's home office, and, as had also been true of the September 15 proposal, each was signed by Mr. Campbell of appellee's Chicago office, with the space next to his signature for home office approval being blank.

In response to these three proposals, each appellant prepared a purchase order for its share of the steel. West Penn's purchase order [Exhibit 13], dated December 10, covers three pages of a 7 x 7½ inch form. It incorporates by reference the August 17, 1964, bid specifications [Exhibit 2] and appellee's proposal (which is described as "dated September 15, 1964, revised October 22, 1964"). With respect to shipment, it specifies the same schedule pleaded in the complaint, which has just been copied above, and states that the steel is to be shipped in proper sequence to permit continuous erection of the towers. However, it specifies no fixed quantities or more precise shipping schedule, nor does it refer to any other document that does. The only reference to price is "APPROXIMATE LIABILITY—$1,400,000." Monongahela's purchase order [Exhibit 14], dated December 11, is on a single page form. It lists the quantities of each type of tower required (e.g., 13 towers 65' 8" high, 10 towers 69' 9" high), but otherwise simply incorporates by reference the bid specifications and appellee's proposal. It states the total price as $902,791. Potomac Edison's purchase order [Exhibit 15], dated December 10, is also on a single page form. It calls for "1 lot transmission towers as per [the bid specifications and appellee's proposal]", at the price of $96,695. It concludes by stating: "Shipping information to be furnished later. Material required on dates specified in summary of proposal Y-1756-C [which contains the schedule pleaded in the complaint, copied above]." All three purchase orders bear the following statement, apparently impressed by a rubber stamp:

Accepted subject to our letter of acknowledgement dated Dec. 21, 1964.
Bethlehem Steel Company
By [signature]
    J. K. Coneen  Manager of Sales
                    Fabricated Steel Construction

The three letters of December 21, 1964—one letter to each appellant [Exhibits 16, 17, 18]—thus referred to were not originally pleaded as part of the evidence of a contract. However, at the end of the case appellants were allowed to amend their complaint to include the letters, appellee having no objection, and we shall therefore regard the letters as having been pleaded from the outset. The letters are brief and virtually identical, and each begins with the following two paragraphs:

"We acknowledge receipt in Bethlehem of your Purchase Order No. . . .dated . . ., covering the furnishing and fabricating of subject transmission towers in accordance with our proposal to you dated October 22, 1964 [Exhibits 5-7], it being understood that all terms and conditions of our proposal are made a part of your Purchase Order.

"Since your Purchase Order covers approximate quantities only, *we cannot schedule our shop operations or establish a firm shipping schedule until firm quantities and a required delivery sequence is established.*" (Emphasis added.)

### Does the Complaint Plead a Breach of Contract?

It will be recalled that the operative paragraph of the complaint is paragraph 7, alleging that appellee "expressly represented and agreed, both in the contracts and otherwise," that it could and would deliver the steel for the towers "in accordance with the foregoing delivery schedules [pleaded in paragraph 6] and in proper sequence to permit continuous erection of the transmission lines." Thus, this is not a case involving the issue of whether there was a contract of sale. There was. As the communications just summarized show, there was agreement with respect to quantity and price; and all of the steel thus specified was eventually delivered and paid for.

*See* U.C.C. §§2-201(1), (2), and (3)(c).[6] Nor is this a case in which it is alleged that the delivery schedule was "left open" but that there is nevertheless a "reasonably certain basis for giving an appropriate remedy," U.C.C. §2-204(3), or that the court should supply a "reasonable time" delivery term, U.C.C. §2-309(1). Rather, appellants have pleaded a breach of an agreement to abide by a specific schedule—one for each appellant—and have alleged damages consequent upon that breach. However, not only did appellee never agree to such a schedule, but at every stage of the dealings it expressly declined to do so. Appellee's Chicago office did propose the schedule, including in the proposal, however, an "Acceptance" clause that the proposal "shall become a contract upon, but not before, acceptance by the Home Office of our company at Bethlehem, Pa." When, in response, each appellant submitted a purchase order, appellee's home office accepted the purchase orders "subject to our letter of acknowledgement of Dec. 21, 1964." In that letter the home office said, "Since your Purchase Order covers approximate quantities only, we cannot schedule our shop operations or establish a firm shipping schedule until firm quantities and a required delivery sequence is established." Nowhere in the complaint is it alleged that this was ever done. Thus it is evident that no breach of contract was pleaded.

The first legal issue involved in this conclusion concerns the validity of the "Acceptance" clause. There can be no doubt about appellee's right to include this clause in its proposal to appellants, nor about the effect of the clause. The clause kept the proposal in effect for seven days but precluded the formation of a contract except upon approval by appellee's home office. Such a clause

6. Act of April 6, 1953, P.L. 3, eff. July 1, 1954, Reenacted Oct. 2, 1959, P.L. 1023, §2, eff. Jan. 1, 1960. 12 A P.S. §§1-101 *et seq.* Cited herein as "U.C.C."

is valid in Pennsylvania under the common law of contracts. If the seller does not authorize the contract or accept the order within a reasonable time, the buyer may revoke its order, but there is no contract until the terms of the clause are met. *McCrea v. Automatic Heat, Inc.*, 161 Pa. Superior Ct. 545, 55 A.2d 564 (1947). "The purpose of [the inclusion of such a standard acceptance clause] is that the negotiating agent shall have no power to bind his principal, and that expressions of agreement on the paper shall therefore be no more than an offer to be accepted or rejected by the principal at his pleasure." 1 Corbin Contracts, §33, at 128-29 (1963).[7]

The second legal issue is whether the "Acceptance" clause was contrary to appellants' original bid documents. The bid documents [Exhibit 1] contain the following paragraph:

"Any contract or purchase order resulting from these Bid Documents will incorporate the terms and provisions of said documents. It will be assumed that Bidder agrees to the provisions of said documents, unless exceptions are specifically and clearly listed in his bid. All such exceptions must be listed together and specifically identified as *Exceptions*. Bidder's

---

7. The "Acceptance" clause is not contrary to any part of the Uniform Commercial Code, *supra*. We have been careful not to refer to appellee's proposal as an "offer," for the "Acceptance" clause is clearly intended to prevent the formation of a contract by the unilateral action of the other party; it reserves the doing of the final act necessary for the formation of the contract (*i.e.*, the acceptance) to appellee's home office. This intent is unambiguous, and thus even if we were to treat appellee's proposal as an offer (which we do not), the clause would not conflict with the only section of the Code arguably applicable, U.C.C. §2-206(1)(a):

"Unless otherwise unambiguously indicated by the language or circumstances

(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances; . . ."

printed terms and conditions are *not* considered specific exceptions."

Without deciding the significance of such a clause generally, we note that here it could not serve to invalidate the "Acceptance" clause. That clause went to whether a contract would be formed at all on any terms; without compliance with it, appellee would never be agreeing to "[a]ny contract or purchase order resulting from these Bid Documents. . . ." The bid documents are silent with respect to the process of contract formation, except to reiterate appellants' common law right to reject any or all bids.[8]

The third legal issue is whether appellee at some stage of the dealings abandoned the "Acceptance" clause. In considering this, some recapitulation will be necessary so that the clause may be considered in every context in which it appeared. It will be recalled that appellee included the "Acceptance" clause in its original proposal [Exhibit 3a], which was dated September 15, 1964. Appellee modified this proposal by two letters dated October 9 and October 12, 1964 [Exhibits 3b and 3c]. However, neither letter was from appellee's home office, and neither mentioned any modification of the "Acceptance" clause; rather, each stated that "[a]ll other terms and conditions of [the September 15 proposal] remain unchanged." By letter dated October 22, 1964 [Exhibit 4], APS informed appellee that it had been chosen to supply the steel, and, it will be recalled, appellee then divided its proposal into three [Exhibits 5, 6, 7], one for each appellant, in order to allow each appellant to submit an appropriate purchase order. Each of these three proposals contained the "Acceptance" clause found in the original proposal. The purchase orders were then submitted, and were accepted by appellee's home office, subject to the letters of December

8. Paragraph 6 of the bid documents reads: "The right is reserved to reject any or all proposals."

21, 1964 [Exhibits 16-18]. Thus, the "Acceptance" clause was never abandoned by appellee, but rather was insisted upon throughout its communications with appellants.

The final legal issue concerns the effect of the letters of December 21, 1964; these represented the home office acceptance referred to in the "Acceptance" clause. It is important to recall at this point that the complaint alleges an explicit agreement as of December 21 to the delivery schedule in the purchase orders. Yet the letters of December 21 withhold any final approval of the delivery schedule. It is true that sometimes a communication will operate as an acceptance even though it states different terms. Thus, U.C.C. §2-207(1) provides that "[a] definite and reasonable expression of acceptance . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." However, the letters of December 21 did make appellee's acceptance "expressly . . . conditional on assent to . . . different terms," for they stated, it will be recalled, as follows: "Since your Purchase Order covers approximate quantities only, we cannot schedule our shop operations or establish a firm shipping schedule until firm quantities and a required delivery schedule is established." We decline to read such plain language as an acceptance and counterproposal, or as an acceptance with a condition subsequent.

In summary: Appellee conditioned its proposal on acceptance by its home office; the home office conditioned its acceptance on the establishment by appellants of firm quantities and a required shipping schedule; appellants did not allege such establishment; therefore, the complaint did not plead a breach of contract, and the nonsuit was properly entered—unless appellants should have been allowed to amend the complaint.

## The Motion to Amend the Complaint

On the last day of the presentation of the case, appellants moved to amend their complaint to add three alternative bases for a contract with respect to the delivery schedule. The amendment adding the first alternative was allowed; the amendments that would have added the second and third were denied. After one witness was recalled for a brief addition to the testimony, appellee's motion for nonsuit was granted.

The first proposed amendment sought to add the letters of December 21, 1964 [Exhibits 16, 17, 18]. Appellee did not object, counsel stating that he had assumed that the letters had been intended from the outset as proof of the contract pleaded in the complaint, and the amendment was allowed. As already discussed, we have therefore treated the letters as if they had been pleaded in the complaint.

The second proposed amendment alleged that by letter of March 9, 1965, from appellee's home office to the APS supervisor of the project [Exhibit 19], appellee undertook to ship by an alternative schedule, which was contained in the letter. The letter is quite short and concludes with the following: "We would appreciate your expediting fabrication and shipping releases and exact count of required towers, body extensions and leg extensions so that it is available to us by May 1st in order for us to maintain the above schedule." We do not agree with appellants that this is merely precatory language. The parties had for some time been in dispute about the delivery of the steel; the sensible reading of the letter is that appellee would only promise to hold to the schedule in the letter if it received the requested information by May 1. This did not occur. Instead, appellants did not respond until May 6, and then their letter did not supply the requested information but merely stated that it was important that appellee stick

to the newly-proposed schedule. Thus the dispute about delivery continued, and there was not any more of an agreement as of March 9, 1965, than there was as of December 21, 1964. Accordingly, a nonsuit would have been proper even if the second amendment had been allowed.

The correctness of this conclusion is confirmed by an incident that occurred during the trial (on April 5, 1973; the trial concluded on May 7; after arguments, the non-suit was entered on May 9). Appellants attempted to introduce in evidence a chart that compared the amounts of steel delivered with three different schedules: the schedule alleged in the complaint (*i.e.*, as of December 21, 1964) ; a schedule based on a letter from appellee dated February 15, 1965 (never pleaded) ; and the sched-ule contained in the letter of March 9, 1965. In the course of colloquy, appellants' counsel made plain that the schedule contained in the letter of March 9, 1965, was not being offered as a separate contract, but rather as evidence of appellee's breach of the schedule pleaded in the complaint. Thus counsel said:

"They [the several schedules] have all been talked about and now what we are trying to do is show that it doesn't really matter too much which schedule you take that has been talked about. They didn't come close to any of them, but I think we are entitled to show how far they fell off. . . ."

This use of the letter of March 9, 1965 (as evidence of breach of another contract) is inconsistent with the theory of appellants' second proposed amendment (that the letter was itself a contract).

This incident of the chart is also pertinent in con-sidering appellants' third proposed amendment. This amendment sought to allege that appellee had agreed to deliver the steel "within a reasonable time." When the chart that has been just discussed was offered by appellants, counsel for appellee objected, in particular

to the jury seeing the first line (which referred to the schedule as of December 21, 1964, pleaded in the complaint). In argument in support of the objection, counsel stated:

> "It made a great deal of sense to proceed in the logical way to see where we were going to, but now we have a chart that is going to purport to compare the purported performance on the part of [appellee] to a particular alleged commitment, and I think the time is ripe to determine whether legally that is going to be in the case or not. . . .
>
> . . . .
>
> ". . . . You will recall that a purchase order was sent in, had reference to that and a letter came back from [appellee] and said we will work out a schedule later. The revised proposal itself says in very plain English that it will not become a contract unless it is accepted by [appellee's] home office and [appellee's] home office acted by the December 21st letter and they said no, in equally plain English, they said you are talking about approximate quantities and sometimes in the future when you are more firmed up we will talk to you about schedules. . . ."

After further argument, the trial judge said: "As you said we haven't heard all of the evidence, but I, as of this point, would not be able to see legally how you could say that the revised proposal [the source of the schedule pleaded in the complaint] is a part of any contract in this case. So that I would regard that line as irrelevant to this case at this time." After further discussion it was agreed that if this one line were removed, the chart would be reintroduced as an exhibit. (In fact this was never done.) Thus, one month before the trial ended, appellants knew that they were in trouble in their effort to prove the breach of contract pleaded in their complaint. If they had any reason to believe they could prove that

appellee had breached a contract to deliver, not according to the specific schedule pleaded in the complaint but "within a reasonable time," then was when they should have moved to amend.

As appellants correctly note, the general rule is that amendments to a pleading are to be liberally allowed and may be made at any point in the litigation. Pa. R.C.P. 1033, 12 P.S. However, the decision whether to allow an amendment is a matter of judicial discretion, and a motion to amend is properly denied when the moving party would gain an inequitable advantage. *See, e.g., Berman v. Herrick,* 424 Pa. 490, 227 A.2d 840 (1967); *Perdue v. Taylor,* 146 Pa. 163, 23 A. 317 (1892); *First Nat. Bk. of Ashley v. Tomichek,* 140 Pa. Superior Ct. 101, 13 A.2d 126 (1940).

Here, the complaint was filed on November 18, 1968, over a year after the power line was placed in operation; the first interrogatories were filed seven months later, on June 18, 1969; the pre-trial discovery process was continuous until the trial began, almost four years later, on March 12, 1973, and included several rulings by the court below; and the trial lasted almost eight weeks. Yet the motion to amend the complaint was not made until the last day of the trial, May 7, 1973.

Had the motion to amend been implicit from developments early in the trial—as was so of the motion to amend by pleading the letters of December 21, 1964— this sequence of events would not be so important. However, the motion sought to make a complete change in the theory of liability. While it is true that U.C.C. §2-309(1) provides that "[t]he time for shipment or delivery . . . under a contract if not . . . agreed upon shall be a reasonable time," until they moved to amend, appellants had never relied on this as a basis for recovery. To the contrary, they had from the outset clung to the delivery schedule pleaded in their complaint as having been agreed upon, and as representing the basis for

damages equal to the entire cost overrun on the project. By not retreating from this theory even when it became clear relatively early in the trial that it was failing, appellants gave the case a distinctive shape, and it is not surprising that the trial judge declined to permit them to change that shape.

To permit a plaintiff to change its claim at the very end of the case may be unjust. The defendant will necessarily have conducted its case in response to the claim as presented; had the defendant known that a change in the claim would be permitted, it might have conducted its cross-examination of the plaintiff's witnesses in an entirely different manner. To be sure, this will not always be so; much will depend on the particular circumstances. Here, had the judge been sitting without a jury, perhaps he would have been willing to allow the amendment, and, so to speak, recast the case and start all over in order to decide whether the steel had been delivered within a reasonable time. However, the judge was sitting with a jury. Considering all of the circumstances, we conclude that it was within his discretion to decide that in offering their amendment, appellants had waited too long.

The judgment of nonsuit is affirmed.

CERCONE, J., concurs in the result.

PRICE, J., did not participate in the consideration or decision of this case.