No. 45,735

Southwest Engineering Company, Inc., a Corporation, *Appellee,*
v. Martin Tractor Company, Inc., a Corporation, *Appellant.*

(473 P. 2d 18)

Opinion filed July 17, 1970.

*Brock R. Snyder,* of Lillard, Eidson, Lewis & Porter, of Topeka, argued the cause and was on the brief for the appellant.

*Terry L. Bullock,* of Cosgrove, Webb & Oman, of Topeka, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This is an action to recover damages for breach of contract. Trial was had to the court which entered judgment in favor of the plaintiff. The defendant has appealed.

Southwest Engineering Company, Inc., the plaintiff, is a Missouri corporation engaged in general contracting work, while the defendant, Martin Tractor Company, Inc., is a Kansas corporation. The two parties will be referred to hereafter either as plaintiff, or Southwest, on the one hand and defendant, or Martin, on the other.

We glean from the record that in April, 1966, the plaintiff was interested in submitting a bid to the United States Corps of Engineers for the construction of certain runway lighting facilities at McConnell Air Force Base at Wichita. However, before submitting a bid, and on April 11, 1966, the plaintiff's construction superintendent, Mr. R. E. Cloepfil, called the manager of Martin's engine department, Mr. Ken Hurt, who at the time was at Colby, asking for a price on a standby generator and accessory equipment. Mr. Hurt replied that he would phone him back from Topeka, which he did the next day, quoting a price of $18,500. This quotation was re-confirmed by Hurt over the phone on April 13.

Southwest submitted its bid on April 14, 1966, using Hurt's figure of $18,500 for the generating equipment, and its bid was accepted. On April 20, Southwest notified Martin that its bid had been accepted. Hurt and Cloepfil thereafter agreed over the phone to meet in Springfield on April 28. On that date Hurt flew to Springfield, where the two men conferred at the airfield restaurant for about an hour. Hurt took to the meeting a copy of the job specifications which the government had supplied Martin prior to the letting.

At the Springfield meeting it developed that Martin had upped its price for the generator and accessory equipment from $18,500 to $21,500. Despite this change of position by Martin, concerning

which Cloepfil was understandably amazed, the two men continued their conversation and, according to Cloepfil, they arrived at an agreement for the sale of a D353 generator and accessories for the sum of $21,500. In addition it was agreed that if the Corps of Engineers would accept a less expensive generator, a D343, the aggregate price to Southwest would be $15,000. The possibility of providing alternate equipment, the D343, was suggested by Mr. Hurt, apparently in an atempt to mollify Mr. Cloepfil when the latter learned that Martin had reneged on its price quotation of April 12. It later developed that the Corps of Engineers would not approve the cheaper generator and that Southwest eventually had to supply the more expensive D353 generator.

At the conference, Mr. Hurt separately listed the component parts of each of the two generators on the top half of a sheet of paper and set out the price after each item. The prices were then totaled. On the bottom half of the sheet Hurt set down the accessories common to both generators and their cost. This handwritten memorandum, as it was referred to during the trial, noted a 10 per cent discount on the aggregate cost of each generator, while the accessories were listed at Martin's cost. The price of the D353 was rounded off at $21,500 and the D343 at $15,000. The memorandum was handed to Cloepfil while the two men were still at the airport. We will refer to this memorandum further during the course of this opinion.

On May 2, 1966, Cloepfil addressed a letter to the Martin Tractor Company, directing Martin to proceed with shop drawings and submittal documents for the McConnell lighting job and calling attention to the fact that applicable government regulations were required to be followed. Further reference to this communication will be made when necessary.

Some three weeks thereafter, on May 24, 1966, Hurt wrote Cloepfil the following letter:

"MARTIN TRACTOR COMPANY, INC.

Topeka    Chanute    Concordia    Colby

CATERPILLAR*

"P. O. Box 1698
Topeka, Kansas
May 24, 1966
Mr. R. E. Cloepfil
Southwest Engineering Co., Inc.
P. O. Box 3314, Glenstone Station
Springfield, Missouri 65804

Dear Sir:

Due to restrictions placed on Caterpillar products, accessory suppliers, and other stipulations by the district governing agency, we cannot accept your letter to proceed dated May 2, 1966, and hereby withdraw all verbal quotations.

Regretfully,

/s/ Ken Hurt

Ken Hurt, Manager

Engine Division"

On receipt of this unwelcome missive, Cloepfil telephoned Mr. Hurt who stated they had some work underway for the Corps of Engineers in both the Kansas City and Tulsa districts and did not want to take on any other work for the Corps at that time. Hurt assured Cloepfil he could buy the equipment from anybody at the price Martin could sell it for. Later investigation showed, however, that such was not the case.

In August of 1966, Mr. Cloepfil and Mr. Anderson, the president of Southwest, traveled to Topeka in an effort to persuade Martin to fulfill its contract. Hurt met them at the company office where harsh words were bandied about. Tempers eventually cooled off and at the conclusion of the verbal melee, hands were shaken all around and Hurt went so far as to say that if Southwest still wanted to buy the equipment from them to submit another order and he would get it handled. On this promising note the protagonists parted.

After returning to Springfield, Mr. Cloepfil, on September 6, wrote Mr. Hurt placing an order for a D353 generator (the expensive one) and asking that the order be given prompt attention, as their completion date was in early December. This communication was returned unopened.

A final effort to communicate with Martin was attempted by Mr. Anderson when the unopened letter was returned. A phone call was placed for Mr. Martin, himself, and Mr. Anderson was informed by the girl on the switchboard that Martin was in Colorado Springs on a vacation. Anderson then placed a call to the motel where he was told Mr. Martin could be reached. Martin refused to talk on the call, on learning the caller's name, and Anderson was told he would have to contact his office.

Mr. Anderson then replaced his call to Topeka and reached either the company comptroller or the company treasurer who responded by cussing him and saying "Who in the hell do you think you are? We don't have to sell you a damn thing."

Southwest eventually secured the generator equipment from Foley Tractor Co. of Wichita, a company which Mr. Hurt had one time suggested, at a price of $27,541. The present action was then filed, seeking damages of $6,041 for breach of the contract and $9,000 for loss resulting from the delay caused by the breach. The trial court awarded damages of $6,041 for the breach but rejected damages allegedly due to delay. The defendant, only, has appealed; there is no cross-appeal by plaintiff.·

The basic disagreement centers on whether the meeting between Hurt and Cloepfil at Springfield resulted in an agreement which was enforceable under the provisions of the Uniform Commercial Code (sometimes referred to as the Code), which was enacted by the Kansas Legislature at its 1965 session. K. S. A. 84-2-201 (1), being part of the Code, provides:

"Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."

Southwest takes the position that the memorandum prepared by Hurt at Springfield supplies the essential elements of a contract required by the foregoing statute, i. e., that it is (1) a writing signed by the party sought to be charged, (2) that it is for the sale of goods and (3) that quantity is shown. In addition, the reader will have noted that the memorandum sets forth the prices of the several items listed.

It cannot be gainsaid that the Uniform Commercial Code has effected a somewhat radical change in the law relating to the formation of enforceable contracts as such has been expounded by this and other courts. In the Kansas Comment to 84-2-201, which closely parallels the Official UCC Comment, the following explanation is given:

"Subsection (1) relaxes the interpretations of many courts in providing that the required writing need not contain all the material terms and that they need not be stated precisely. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. Only three definite and invariable requirements as to the writing are made by this subsection. First, it must evidence a contract for the sale of goods; second, it must be 'signed,' a word which includes any authentication which identifies the party

to be charged; and third, it must specify quantity. Terms relating to price, time, and place of payment or delivery, the general quality of goods, or any particular warranties may all be omitted."

From legal treatises, as well, we learn that the three invariable requirements of an enforceable written memorandum under 84-2-201 are that it evidence a sale of goods, that it be signed or authenticated and that it specify quantity. In Vernon's Kansas Statutes Annotated, Uniform Commercial Code, Howe and Navin, the writers make this clear:

"Under the Code the writing does not need to incorporate all the terms of the transaction, nor do the terms need to be stated precisely. The Code does require that the writing be broad enough to indicate a contract of sale between the parties; that the party against whom enforcement is sought, or his agent, must have signed the writing; and that the quantity dealt with must be stated. Any error concerning the quantity stated in the memorandum prevents enforcement of the agreement beyond the precise quantity stated." (p. 116.)

The defendant does not seriously question the interpretation accorded the statute by eminent scriveners and scholars, but maintains, nonetheless, that the writing in question does not measure up to the stature of a signed memorandum within the purview of the Code; that the instrument simply sets forth verbal quotations for future consideration in continuing negotiations.

But on this point the trial court found there *was* an agreement reached between Hurt and Cloepfil at Springfield; that the formal requirements of K. S. A. 84-2-201 *were* satisfied; and that the memorandum prepared by Hurt contains the three essentials of the statute in that it evidences a sale of goods, was authenticated by Hurt and specifies quantity. Beyond that, the court specifically found that Hurt had apparent authority to make the agreement; that both Southwest and Martin were "merchants" as defined in K. S. A. 84-2-104; that the agreement reached at Springfield included additional terms not noted in the writing: (1) Southwest was to install the equipment; (2) Martin was to deliver the equipment to Wichita and (3) Martin was to assemble and supply submittal documents within three weeks; and that Martin's letter of May 24, 1966, constituted an anticipatory breach of the contract.

We believe the record supports all the above findings. With particular reference to the preparation and sufficiency of the written memorandum, the following evidence is pertinent:

Mr. Cloepfil testified that he and Hurt sat down at a restaurant table and spread out the plans which Hurt had brought with him;

that they went through the specifications item by item and Hurt wrote each item down, together with the price thereof; that while the specifications called for a D353 generator, Hurt thought the D343 model might be an acceptable substitute, so he gave prices on both of them and Southwest could take either one of the two which the Corps of Engineers would approve; that Hurt gave him (Cloepfil) the memorandum "as a record of what we had done, the agreement we had arrived at at our meeting in the restaurant at the airport."

We digress at this point to note Martin's contention that the memorandum is not signed within the meaning of 84-2-201. The sole authentication appears in handprinted form at the top left-hand corner in these words: "Ken Hurt, Martin Tractor, Topeka, Caterpillar." The court found this sufficient, and we believe correctly so.

K. S. A. 84-1-201 (39) provides as follows:

" 'Signed' includes any symbol executed or adopted by a party with present intention to authenticate a writing."

The official U. C. C. Comment states in part:

"The inclusion of authentication in the definition of 'signed' is to make clear that as the term is used in this Act a complete signature is not necessary. Authentication may be printed, stamped or written; . . . It may be on any part of the document and in appropriate cases may be found in a billhead or letterhead. . . . The question always is whether the symbol was executed or adopted by the party with present intention to authenticate the writing."

Hurt admittedly prepared the memorandum and has not denied affixing his name thereto. We believe the authentication sufficiently complies with the statute.

The evidence already cited would be ample to sustain the trial court's finding that an agreement was reached between Hurt and Cloepfil in Springfield. However, Cloepfil's testimony is not the only evidence in support of that finding. In a pretrial deposition, Mr. Hurt, himself, deposed that "we agreed on the section that I would be quoting on, and we come to some over-all general agreement on the major items." At the trial Hurt testified he did not wish to change that statement in any way.

Hurt further testified that in his opinion the thing which stood in the way of a firm deal was Martin's terms of payment—that had Southwest agreed with those terms of payment, so far as he was concerned, he would have considered a firm deal was made. Mr.

Hurt acknowledged while on the stand that he penned the memo-
randum and that as disclosed therein a 10 per cent discount was
given Southwest on the price of either of the generators listed (de-
pending on which was approved by the Corps of Engineers), and
that the accessories common to both generators were to be net—
that is, sold without profit.

It is quite true, as the trial court found, that terms of payment
were not agreed upon at the Springfield meeting. Hurt testified
that as the memorandum was being made out, he said they wanted
10 per cent with the order, 50 per cent on delivery and the balance
on acceptance, but he did not recall Cloepfil's response. Cloepfil's
version was somewhat different. He stated that after the two had
shaken hands in the lobby preparing to leave, Hurt said their terms
usually were 20 per cent down and the balance on delivery; while
he (Cloepfil) said the way they generally paid was 90 per cent on
the tenth of the month following delivery and the balance on final
acceptance. It is obvious the parties reached no agreement on this
point.

However, a failure on the part of Messrs. Hurt and Cloepfil to
agree on terms of payment would not, of itself, defeat an otherwise
valid agreement reached by them. K. S. A. 84-2-204(3) reads:

"Even though one or more terms are left open a contract for sale does not
fail for indefiniteness if the parties have intended to make a contract and there
is a reasonably certain basis for giving an appropriate remedy."

The official U. C. C. Comment is enlightening:

"Subsection (3) states the principle as to 'open terms' underlying later sec-
tions of the Article. If the parties intend to enter into a binding agreement,
this subsection recognizes that agreement as valid in law, despite missing
terms, if there is any reasonably certain basis for granting a remedy. The
test is not certainty as to what the parties were to do nor as to the exact
amount of damages due the plaintiff. Nor is the fact that one or more terms
are left to be agreed upon enough of itself to defeat an otherwise adequate
agreement. Rather, commercial standards on the point of 'indefiniteness'
are intended to be applied, this Act making provision elsewhere for missing
terms needed for performance, open price, remedies and the like.

"The more terms the parties leave open, the less likely it is that they have
intended to conclude a binding agreement, but their actions may be frequently
conclusive on the matter despite the omissions."

The above Code provision and accompanying Comment were
quoted in *Pennsylvania Co. v. Wilmington Trust Co.,* 39 Del. Ch.
453, 166 A. 2d 726, where the court made this observation:

"There appears to be no pertinent court authority interpreting this rather

recent but controlling statute. In an article entitled 'The Law of Sales In the Proposed Uniform Commercial Code,' 63 Harv. Law Rev. 561, 576, Mr. Williston wanted to limit omissions to 'minor' terms. He wanted 'business honor' to be the only compulsion where 'important terms' are left open. Nevertheless, his recommendation was rejected (see note on p. 561). This shows that those drafting the statute intended that the omission of even an important term does not prevent the finding under the statute that the parties intended to make a contract." (pp. 731, 732.)

So far as the present case is concerned, K. S. A. 84-2-310 supplies the omitted term. This statute provides in pertinent part:

"Unless otherwise agreed

"(a) payment is due at the time and place at which the buyer is to receive the goods even though the place of shipment is the place of delivery;"

In our view, the language of the two Code provisions is clear and positive. Considered together, we take the two sections to mean that where parties have reached an enforceable agreement for the sale of goods, but omit therefrom the terms of payment, the law will imply, as part of the agreement, that payment is to be made at time of delivery. In this respect the law does not greatly differ from the rule this court laid down years ago.

In *Thompson v. Seek,* 84 Kan. 674, 115 Pac. 397, the parties entered into a written agreement for the sale of corn at a stated price to be delivered at Thompson's elevator. Terms of payment were not mentioned. Thompson was unable to pay cash on delivery but proposed to pay by check instead. Seek refused this tender and rescinded the contract, whereupon Thompson sued for breach of contract. The decision of the court is reflected in Syllabus 1:

"A written contract for the purchase of corn to be delivered at the buyer's elevator implies payment in cash, and upon offer to deliver, and refusal to pay except by check, at a time when banks are not honoring checks by paying cash, the buyer is not entitled to damages for failure to deliver."

We do not mean to infer that terms of payment are not of importance under many circumstances, or that parties may not condition an agreement on their being included. However, the facts before us hardly indicate that Hurt and Cloepfil considered the terms of payment to be significant, or of more than passing interest. Hurt testified that while he stated his terms he did not recall Cloepfil's response, while Cloepfil stated that as the two were on the point of leaving, each stated their usual terms and that was as far as it went. The trial court found that only a brief and casual conversation ensued as to payment, and we think that is a valid summation of what took place.

Moreover, it is worthy of note that Martin first mentioned the omission of the terms of payment, as justifying its breach, in a letter written by counsel on September 15, 1966, more than four months after the memorandum was prepared by Hurt. On prior occasions Martin attributed its cancellation of the Springfield understanding to other causes. In its May 24 letter, Martin ascribed its withdrawal of "all verbal quotations" to "restrictions placed on Caterpillar products, accessory suppliers, and other stipulations by the district governing agency." In explaining the meaning of the letter to Cloepfil, Hurt said that Martin was doing work for the Corps of Engineers in the Kansas City and Tulsa districts and did not want to take on additional work with them at this time.

The entire circumstances may well give rise to a suspicion that Martin's present insistence that future negotiations were contemplated concerning terms of payment, is primarily an afterthought, for use as an escape hatch. Doubtless the trial court so considered the excuse in arriving at its findings.

We are aware of Martin's argument that Southwest's letter of May 2, 1966, referring to the sale is evidence that no firm contract had been concluded. Granted that some of the language employed might be subject to that interpretation, the trial court found, on what we deem to be substantial, competent evidence, that an agreement of sale *was* concluded at Springfield. Under our invariable rule those findings are binding upon this court on appeal even though there may have been evidence to the contrary. (See cases in 1 Hatcher's Kansas Digest [Rev. Ed.] Appeal & Error, §§ 507, 508.)

The defendant points particularly to the following portion of the May 2 letter, as interjecting a new and unacceptable term in the agreement made at Springfield.

". . . We are not prepared to make a partial payment at the time of placing of this order. However, we will be able to include 100% of the engine-generator price in our first payment estimate after it is delivered, and only 10% will have to be withheld pending acceptance. Ordinarily this means that suppliers can expect payment of 90% within about thirty days after delivery."

It must be conceded that the terms of payment proposed in Southwest's letter had not been agreed to by Martin. However, we view the proposal as irrelevant. Although terms of payment had not been mutually agreed upon, K. S. A. 84-2-310 supplied the missing terms, *i. e.*, payment on delivery, which thus became part of the agreement already concluded. In legal effect the proposal was no more than

one to change the terms of payment implied by law. Since Martin did not accept the change, the proposal had no effect, either as altering or terminating the agreement reached at Springfield. As the Michigan Court of Appeals said in *American Parts v. Arbitration Assn.*, 8 Mich. App. 156, 154 N. W. 2d 5:

". . . Surely a party who has entered into an agreement cannot change that agreement by the simple expedient of sending a written 'confirmation' containing additional or different terms . . ." (p. 174.)

Neither, may we add, will an extraneous proposal which materially alters the original agreement, be included unless agreed to by the other party. (*Application of Doughboy Industries, Inc.*, 233 N. Y. S. 2d 488, 17 A. D. 2d 216.)

Substantial parts of the briefs filed by both parties are devoted to discussions of the meaning and effect of K. S. A. 84-2-207. This murky bit of prose, which the United States Court of Appeals, First Circuit, characterized in *Roto-Lith, Ltd. v. F. P. Bartlett & Co.*, 297 F. 2d 497 (1962) as "not too happily drafted" has given rise to a good deal of litigation and has prompted a spate of learned articles from legal savants. Section (1) and (2) of this statute read:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

"(*a*) the offer expressly limits acceptance to the terms of the offer;

"(*b*) they materially alter it; or

"(*c*) notification of objection to them has already been given or is given within a reasonable time after notice of them is received."

The discussions centering on this section of the Code are occasioned by findings of the trial court that Southwest's letter of May 2 is both an "acceptance" and a "confirmation" within the purview thereof; that as either an "acceptance" or "confirmation" the letter stated additional terms which were different from those agreed upon and which constituted a material alteration of the agreement. In view of the court's previous findings that a viable contract had already been concluded at Springfield, we deem these findings superfluous and extraneous.

We do not propose to engage in an extended dissertation upon the purpose or meaning of 84-2-207. In our view the statute is not

germane to the facts of this case; we think it designed for situations where an open offer is accepted by "an expression of acceptance" (we presume in writing) or where an oral agreement is later confirmed in writing. Neither situation is presented in the case now before us.

The trial court found that an enforceable agreement, memorialized in writing, had been reached in Springfield. This finding implies both offer and acceptance, the two being merged into the resulting contract. When the letter of May 2, 1966, was written there was no outstanding offer to accept—conditionally or otherwise. Neither was there an oral agreement to confirm—the agreement having previously been memorialized in the written memorandum of April 28.

As we read the authorities pointed out by counsel on both sides, as they have attempted to divine for us the sense of 84-2-207, none of them appear to fit the pattern of the present action. The cited cases involve either an outstanding offer, accepted by written instrument containing different or added terms, or an oral agreement later confirmed by a writing which states new or additional terms. In this connection, while we recognize that the term "confirmation" may be employed in a variety of meanings, we think it is used in 84-2-207 in the sense of "a written order or agreement that verifies or substantiates an agreement previously concluded orally." (Webster's Third New International Dictionary, Unabridged.)

Neither confirmation nor acceptance by Southwest was needed on May 2 to breathe life into the agreement previously concluded at Springfield, for it was memorialized in writing at the time of making. In an article entitled "The Law of Sales Under the Uniform Commercial Code, 17 Rutgers Law Review 14, Professor Calvin W. Corman writes:

"The Code Provision merely requires that the writing be sufficient to indicate that a contract for sale has been made between the parties." (p. 20.)

In our opinion the instant memorandum amply satisfies that requirement, affording a substantial basis for the belief that it rests on a real transaction. (See *Harry Rubin & Sons, Inc. v. Con. P. Co. of Am.*, 396 Pa. 506, 512, 153 A. 2d 472.)

We find no error in this case and the judgment of the trial court is affirmed.