**DAITOM, INC., Plaintiff-Appellant,**

v.

**PENNWALT CORPORATION,**
**Defendant-Appellee.**

No. 82–1813.

United States Court of Appeals,
Tenth Circuit.

Aug. 17, 1984.

James M. Warden, Blackwell, Sanders, Matheny, Weary & Lombardi, Olathe, Kan. (Alan P. Blinzler and Peter A. Martin, Blackwell, Sanders, Matheny, Weary &

Lombardi, Olathe, Kan., with him on the briefs), for plaintiff-appellant.

Leo P. Dreyer, Shook, Hardy & Bacon, Kansas City, Mo. (David K. Hardy and J. Richard Golub, Shook, Hardy & Bacon, Kansas City, Mo., and David M. Druten, Rushfelt, Meuller, Lamar, Druten & Moran, Kansas City, Kan., with him on the brief), for defendant-appellee.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

## I. STATEMENT OF THE CASE

This is an appeal from the grant of summary judgment against Daitom, Inc. (Daitom), the plaintiff below. The result was dismissal by the United States District Court for the District of Kansas of all three counts of Daitom's complaint.

Daitom had brought this diversity action in federal court on March 7, 1980 against Pennwalt Corporation and its Stokes Vacuum Equipment Division (Pennwalt). Counts I and II of Daitom's complaint alleged breach of various express and implied warranties and Count III alleged negligent design and manufacture by Pennwalt of certain rotary vacuum drying machines sold to and used commercially by Daitom in the production of a vitamin known properly as dextro calcium pantothenate and commonly as Vitamin B–5.

Daitom is a Delaware chartered corporation having its principal place of business in Kansas. It was formed to implement a joint venture between Thompson-Hayward Chemical Company, Inc. of Kansas City, Kansas and Daiichi-Seiyakii Co., Ltd., of Tokyo, Japan. Pennwalt is a Pennsylvania chartered corporation with its principal place of business in Pennsylvania.

Daitom requests a reversal of the district court's grant of summary judgment against Daitom on all counts of its complaint and seeks a remand for a trial on the merits.

We have concluded that there should be a reversal with respect to Counts I and II,

together with a remand to the district court for a trial on the merits of those claims. On the other hand, we have concluded that there should be an affirmance of the summary judgment against Daitom on Count III of its complaint.

## II. FACTS

The essential facts so far as they pertain to the issues presented in this appeal are as follows.

For the purpose of implementing its joint venture, Daitom planned to construct and operate a manufacturing plant to commercially produce dextro calcium pantothenate. The design of the plant was undertaken and handled on behalf of Daitom by Kintech Services, Inc. (which company will be referred to as Kintech), an engineering design firm located in Cincinnati, Ohio. Kintech had the responsibility not only for designing the plant; it also was responsible for investigating various means of drying the product during the production process, and for negotiating the purchase of certain equipment to be used in the plant. Included in the equipment was automated drying equipment to be used in removing methonol and water from the processed vitamin as part of the purification process.

There were numerous tests made and conducted at Kintech's request by equipment manufacturers. Kintech formulated specifications for the automated drying equipment. (This is referred to as Kintech Specification 342, Record, Volume I, at 59–65). On behalf of Daitom, Kintech invited various vendors to bid on the needed equipment.

Pennwalt, on September 7, 1976, submitted a proposal for the sale of two rotary vacuum dryers with dust filters and heating systems to dry dextro calcium pantothenate. The typewritten proposal specified the equipment to be sold, the f.o.b. price, and delivery and payment terms. A preprinted conditions of sale form was also attached to the proposal and explicitly made an integral part of the proposal by the typewritten sheet.

Kintech recommended to Daitom that Pennwalt's proposal be accepted and on October 5, 1976, well within the thirty-day acceptance period specified in the proposal, Daitom issued a purchase order for the Pennwalt equipment. The purchase order consisted of a pre-printed form with the identification of the specific equipment and associated prices typewritten in the appropriate blank spaces on the front together with seventeen lengthy "boilerplate" or "standard" terms and conditions of sale on the back. In addition, on the front of the purchase order in the column marked for a description of the items purchased, Daitom typed the following:

> Rotary vacuum dryers in accordance with Kintech Services, Inc. specification 342 dated August 20, 1976, and in accordance with Stokes proposal dated September 7, 1976.

The two rotary vacuum dryers and the equipment that went along with them were manufactured by Pennwalt and delivered to Daitom's plant in early May 1977. For the reason that there had been no construction of Daitom's plant, the crated equipment was not immediately installed. Instead, it was stored outside in crates. On June 15, 1978, the dryers were finally installed and first operated by Daitom. Daitom notified Pennwalt of serious problems with the operation of the dryers on June 17, 1978.

Daitom's contention was that the dryers suffered from two severe defects: 1) they were delivered with misaligned agitator blades causing a scraping and damaging of the dryer interiors and an uneven distribution of the products being dried; and 2) they were undersized necessitating an overloading of the dryers and a "lumping up" of the product rendering it unsuitable for further use. Pennwalt's repair personnel visited the Daitom plant to investigate the alleged operating difficulties, but Daitom contends the dryers were not repaired and have never performed as required under the specifications and as represented by Pennwalt. This was the basis for the lawsuit.

This suit was brought in federal court on March 7, 1980, after Pennwalt's alleged failure to correct the difficulties with the dryers. On Pennwalt's motion, the district court granted summary judgment against Daitom on all three counts of its complaint. The court dismissed Counts I and II after applying section 2–207 of the Uniform Commercial Code (U.C.C.) and finding that Daitom's breach of warranties claims were barred by the one-year period of limitations specified in Pennwalt's proposal. The court further concluded that alleged damages in Count III for the negligent design and manufacture of the dryers were not available in tort; the sole remedy being in an action for breach of warranties which here was barred by the period of limitations. Consequently, summary judgment was granted against Daitom. Daitom's subsequent motion for reconsideration was denied by the district court on June 3, 1982, and following that, this appeal took place.

## III. DISCUSSION

### A. *The Issues*

It is to be noted that the district court granted summary judgment against Daitom on Counts I and II of the complaint, finding the breach of warranties claim barred by the one-year period of limitations which was set forth in Pennwalt's proposal. In ruling against Daitom the court followed a three step analysis. First, it concluded that pursuant to U.C.C. § 2–207(1), a written contract for the sale of the rotary dryers was formed by Pennwalt's September 7, 1976 proposal and Daitom's October 5, 1976 purchase order accepting that proposal. Second, the court found that the one year period of limitations specified in Pennwalt's proposal and shortening the typical four-year period of limitations available under the U.C.C. became part of the contract of sale and governed the claims for breach of warranties. Thus, the court accepted the proposal that was contained in the documents that had been submitted by the defendant-appellee. Third, the court concluded that the one-year period of limitations was not tolled by any conduct of

Pennwalt's, so that consequently, Daitom's claims were barred because they were brought after the expiration of the one year limitations period. The view we have of the submission and response is that the approval was initial and general and contemplated further discussion and improvement.

The circumstances surrounding the delivery of this equipment and what occurred thereafter is of high importance. The equipment was delivered in crates and boxes, and at that time Daitom had no plant. Instead of seeking to protect the equipment in some way, Pennwalt simply delivered the boxes and left. The documents which were part of the delivery provided for this one-year period of limitations specified in the Pennwalt proposal. Seemingly, this conduct on the part of Pennwalt in making a quick delivery and quick departure took hold in connection with the motion for summary judgment, the court ruling that more than one year had passed before they were able to try out the machinery and discover the defects. The suggestion is made as to how this machinery could have been utilized or contested because of the conditions that were present. Why, then should the one-year limitations period, created by Pennwalt, be allowed to take effect?

Daitom has challenged the district court's findings as to the terms which became a part of the contract. Daitom argues that its October 5, 1976 purchase order did not constitute an acceptance of Pennwalt's September 7, 1976 proposal. Instead, Daitom claims that its purchase order explicitly made acceptance conditional on Pennwalt's assent to the additional or different terms in the purchase order. As a consequence, Daitom argues, pursuant to U.C.C. § 2-207(1),[1] the exchanged writings of the parties did *not* form a contract, because Pennwalt failed to assent to the additional or different terms in the purchase order. The most relevant additional or different terms Daitom alleges were in *its* purchase order were the terms reserving all warranties and remedies available in law, despite Pennwalt's limitation of warranties and remedies in its proposal. In a sense Pennwalt argues it enjoyed an exclusive right to set the conditions.

Daitom argues that on their face the writings failed to create a contract, and, instead, that a contract was to be formed by *the conduct* of both parties, pursuant to § 2-207(3), and the resulting contract consisted of the terms on which the writings agreed, together with "any supplementary terms incorporated under any other provision of [the UCC]." Therefore, Daitom concludes, the resulting contract governing the sale of the rotary dryers incorporated the U.C.C. provisions for express warranties (§ 2-313), implied warranties (§§ 2-314, 2-315), and a four year period of limitations.

As an alternative argument, Daitom contends that even if its October 5, 1976 purchase order did constitute an acceptance of Pennwalt's September 7, 1976 proposal and did form a contract, all conflicting terms between the two writings were "knocked out" and did not become part of the resulting contract, because of their being at odds one with the other. Therefore, Daitom concludes once again that the resulting contract consisted of only those terms in which the writings agreed and any supplementary or "gap-filler" terms incorporated under the provisions of the U.C.C.; specifically §§ 2-313, 2-314, 2-315, 2-725.

Daitom makes a further argument which has some appeal and that is that even if the one-year period of limitations specified in Pennwalt's proposal became a part of the sales contract, it was tolled by Pennwalt's wrongful conduct, which included fraudulent concealment of the equipment's de-

1. The parties, throughout this litigation and through their briefs, agree that the law of Pennsylvania governs their warranty claims. The parties further agree that Pennsylvania has adopted the provisions of the Uniform Commercial Code and that for the purpose of this action the Pennsylvania statute does not modify the U.C.C. provisions. See 13 Pa.C.S.A. § 2207 (Purdon's 1984). Therefore, throughout this memorandum the relevant code sections will be referred to only by the U.C.C. numeral designation.

fects and failure of the essential purpose of the limited remedies. Since this court's decision does not rely on the question of the tolling of the limitations period, we will not devote detailed argument to this.

■ In reviewing the order of summary judgment issued by the court below, we do not apply the clearly erroneous standard of review, but instead consider the case in the same manner as the trial court. *Western Casualty & Surety Company v. National Union Fire Insurance Company*, 677 F.2d 789, 791 n. 1 (10th Cir.1982); *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1377 (10th Cir.1980). We must, therefore, examine the record to determine whether any genuine issue of material fact pertinent to the ruling exists, and if not, whether the substantive law was correctly applied. *Western Casualty, supra;* Fed.R. Civ.P. 56. After considering the record in the instant case, it is apparent that the substantive law was not correctly applied and that summary judgment against Daitom on Counts I and II was improper. The fundamental feature with respect to this is this court's determination of whether any terms in the parties' writings conflicted and, if so, which terms became part of the resultant contract.

## B. *The Applicable Law*

The district court found the dispute between Daitom and Pennwalt involved a "transaction in goods," between persons who are "merchants" and, therefore, was governed by Article 2 of the U.C.C. U.C.C. §§ 2–102, 2–104. The district court also

stated that the dispute is a classic example of the "battle of the forms."

As previously noted, there has been agreement that the law of Pennsylvania governs these claims for breach of warranty and Pennsylvania has adopted the provisions of the U.C.C. Section 2–207 of the U.C.C. was specifically drafted to deal with the battle of the forms and related problems.[2] U.C.C. § 2–207, Comment 1.

■ Section 2–207 has been commented on in one case as a "murky bit of prose," (*Southwest Engineering Co., Inc. v. Martin Tractor Co., Inc.*, 205 Kan. 684, 473 P.2d 18, 25 (1970)), and as "one of the most important, subtle, and difficult in the entire code, and well it may be said that the product as it finally reads is not altogether satisfactory." (Duesenberg & King, 3 *Sales and Bulk Transfer Under the Uniform Commercial Code*, § 3.03 at 3–12 (1984)). The Pennsylvania Supreme Court has not addressed the issues presented by this case. In the absence, therefore, of an authoritative pronouncement from the state's highest court, our task is to regard ourselves as sitting in diversity and predicting how the state's highest court would rule. *Pennsylvania Glass Sand Corporation v. Caterpillar Tractor Company*, 652 F.2d 1165, 1167 (3rd Cir.1981). This court must also follow any intermediate state court decision unless other authority convinces us that the state supreme court would decide otherwise. *Delano v. Kitch*, 663 F.2d 990, 996 (10th Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). Also, the policies underlying the applicable legal doctrines, the

---

2. Section 2–207 provides in full:

2–207. Additional Terms in Acceptance or Confirmation.

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;
(b) they materially alter it; or
(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

doctrinal trends indicated by these policies, and the decisions of other courts may also inform this court's analysis. *Pennsylvania Glass Sand, supra,* at 1167 (3rd Cir. 1981). With these standards in mind, we proceed to consider and analyze the case.

## C. *The writings and the contract.*

The trial court concluded that the parties' exchanged writings formed a contract. Thus, there was not a formal single document. Pennwalt's September 7, 1976 proposal constituted the offer and Daitom's October 5, 1976 purchase order constituted the acceptance.

It is essentially uncontested that Pennwalt's proposal constituted an offer. The proposal set forth in some detail the equipment to be sold to Daitom, the price, the terms of shipment, and specifically stated that the attached terms and conditions were an integral part of the proposal. One of those attached terms and conditions of sale limited the warranties to repair and replacement of defective parts and limited the period of one year from the date of delivery for any action for breach of warranty.[3]

3. Paragraph 5 of the terms and conditions of sale stated in full (emphasis added):
6. WARRANTIES:
a. Seller warrants that at the time of delivery of the property to the carrier, it will be, unless otherwise specified, new, free and clear of all lawful liens and security interest or other encumbrances unknown to Buyer. If, within a period of one year from the date of *such delivery* any parts of the property (except property specified to be used property or normal wear parts) fail because of material or workmanship which was defective at the time of such delivery, Seller will repair such parts, or furnish parts to replace them f.o.b. Seller's or its supplier's plant, provided such failure is due solely to such defective material or workmanship and is not contributed to by any other cause, such as improper care or unreasonable use, and provided such defects are brought to Seller's attention for verification when first discovered, and the parts alleged to be so defective are returned, if requested, to Seller's or its supplier's plant. *No action for breach of warranty shall be brought more than one year after the cause of action has accrued*
SELLER MAKES NO OTHER WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, IN-

The proposal was sent to Kintech and forwarded to Daitom with a recommendation to accept the proposal. Daitom sent the October 5, 1976 purchase order to Pennwalt. This purchase order constituted an acceptance of Pennwalt's offer and formed a binding contract for the sale only pursuant to 2–207(1), despite the statement of terms additional to or different from those in the offer.[4] But these terms were not without meaning or consequence. However, the acceptance was not expressly conditioned on Pennwalt accepting these additional or different terms.

There is a provision which Daitom contends made the acceptance expressly conditional on Pennwalt's accepting the additional or different terms which appeared in the pre-printed, standard "boilerplate" provisions on the back of the purchase order. It stated:

Acceptance. Immediate acceptance is required unless otherwise provided herein. It is understood and agreed that the written acceptance by Seller of this purchase order or the commencement of any work performance of any services hereunder

CLUDING ANY WARRANTY OF FITNESS OF THE PROPERTY FOR ANY PARTICULAR PURPOSE EVEN IF THAT PURPOSE IS KNOWN TO SELLER.
*In no event shall Seller be liable for consequential damage.*
b. Because of varied interpretations of standards at the local level, Seller cannot warrant that the property meets the requirements of the Occupational Safety and Health Act.

4. The principal additional or different terms referred to the reservation of warranties. Specifically:
(8) WARRANTY. The Seller warrants that the supplies covered by this purchase order will conform to the specifications, drawings, samples, or other descriptions furnished or specified by buyer, and will be fit and sufficient for the purpose intended, merchantable, of good material and workmanship, and free from defect. The warranties and remedies provided for in this paragraph ... shall be in addition to those implied by or available at law and shall exist not withstanding [sic] the acceptance by Buyer of all or a part of this applies with respect to which such warranties and remedies are applicable.

by the Seller, (including the commencement of any work or the performance of any service with respect to samples), shall constitute acceptance by Seller of this purchase order and of all the terms and conditions of such acceptance is *expressly limited to such terms and conditions, unless each deviation is mutually recognized therefore in writing.* (Emphasis added.)

▆▆▆ This language does not preclude the formation of a contract by the exchanged writings pursuant to § 2–207(1). Nor does it dictate the adoption of a conclusion holding that as a result the acceptance provided the applicable terms of the resulting contract. First, it is well established that a contract for the sale of goods may be made in any manner to show agreement, requiring merely that there be some objective manifestation of mutual assent, but that there must be. There is not a contract until it takes place. See U.C.C. § 2–204; *Ore & Chemical Corporation v. Howard Butcher Trading Corp.*, 455 F.Supp. 1150, 1152 (E.D.Pa.1978). Here there is such an objective manifestation of agreement on essential terms of equipment specifications, price, and the terms of shipment and payment, all of which took place before the machinery was put to any test. The purchase order explicitly referred to and incorporated on its front Kintech's equipment specifications and Pennwalt's proposal. But we are unwilling to hold such a typewritten reference and incorporation by Daitom brings the matter to a close. The acceptance and warranty terms as provided for by the above excerpted acceptance clause, does manifest a willingness on all essential terms to accept the offer and form a contract. *Cf., Daitom v. Henry Vogt Machine Co.,* No. 80–2081 (D.Kan., unpublished 2/22/82) (In that case the court held that under identical factual circumstances and involving the identical purchase order form language, such typewritten reference and incorporation of the offer constituted a written modification of the purchase order's boilerplate acceptance terms to conform to those in the offer.)

This was, of course, before an attempt was made to use the equipment.

Second, the boilerplate provision does not directly address the instant case. The purchase order is drafted principally as an *offer* inviting acceptance. Although this court recognizes that the form may serve a dual condition depending on the circumstances, the imprecision of language that permits such service detracts from Daitom's argument of conditional acceptance.

Third, the courts are split on the application of § 2–207(1) and the meaning of "expressly made conditional on assent to the additional or different terms." *See Boese-Hilburn Co. v. Dean Machinery,* 616 S.W.2d 520 (Mo.App.1981). *Roto-Lith Ltd. v. F.P. Bartlett & Co., Inc.,* 297 F.2d 497 (1st Cir.1962) represents one extreme of the spectrum, that the offeree's response stating a term materially altering the contractual obligations solely to the disadvantage of the offeror constitutes a conditional acceptance. The other extreme of the spectrum is represented by *Dorton v. Collins & Aikman Corporation,* 453 F.2d 1161 (6th Cir.1972), in which case the court held that the conditional nature of the acceptance should be so clearly expressed in a manner sufficient to notify the offeror that the offeree is unwilling to proceed with the transaction unless the additional or different terms are included in the contract. The middle of the spectrum providing that a response merely "predicating" acceptance on clarification, addition or modification is a conditional acceptance is represented by *Construction Aggregates Corp. v. Hewitt-Robins, Inc.,* 404 F.2d 505 (7th Cir.1968), *cert. denied,* 395 U.S. 921, 89 S.Ct. 1774, 23 L.Ed.2d 238 (1969).

The facts of this case, Daitom asserts, are not of a character that would suggest that there had been an unequivocal acceptance. The defendant-appellee was aware that the machinery had not even been tried. Once it was tried, it broke down in a very short time. It is hard to see a justifiable acceptance, Daitom asserts, when the buyer does not even know whether it works, and, in fact, learns after the fact, that it

does not work. This fact alone renders the "contract" to be questionable.

■ The better view as to the meaning and application of "conditional acceptance," and the view most likely to be adopted by Pennsylvania, is the view in *Dorton* that the offeree must explicitly communicate his or her unwillingness to proceed with the transaction unless the additional or different terms in its response are accepted by the offeror. *Accord, Ebasco Services, Inc. v. Pennsylvania Power & Light Co.*, 402 F.Supp. 421 (E.D.Pa.1975) (applying Pennsylvania law); *Ore & Chemical Corp., supra* (applying New York and Pennsylvania law). In *West Penn Power Co. v. Bethlehem Steel Corporation*, 236 Pa.Super. 413, 348 A.2d 144 (1975), the Pennsylvania court held the offeror's response expressly conditional, because it conditioned acceptance on the establishment of firm quantities and a required shipping schedule—two terms integral to any fundamental agreement. Here the additional or different terms in Daitom's purchase order were, to be sure, boilerplate terms. And though important in themselves, they do not come out and state an unwillingness to proceed with the purchase of the rotary dryers if the terms were not assented to by Pennwalt. But certainly an underlying condition represented in the purchase order is that the machinery would function and perform the job for which it had been purchased. Ability to function may outstrip boilerplate. As far as the writings are concerned, it would appear that there was perhaps a contract for the sale of the dryers pursuant to § 2–207(1), but the importance of the essential facts cannot be overlooked, and particularly the differing terms in the exchanged writings.

Having found an offer and an acceptance which was not made expressly conditional on assent to additional or different terms, we must now decide the effect of those additional or different terms on the result-ing contract and what terms became part of it. The district court simply resolved this dispute by focusing solely on the period of limitations specified in Pennwalt's offer of September 7, 1976. Thus, the court held that while the offer explicitly specified a one-year period of limitations in accordance with § 2–725(1) allowing such a reduction, Daitom's acceptance of October 5, 1976 was silent as to the limitations period. Consequently, the court held that § 2–207(2) was inapplicable and the one-year limitations period controlled, effectively barring Daitom's action for breach of warranties.

While the district court's analysis undertook to resolve the issue without considering the question of the application of § 2–207(2) to additional or different terms, we cannot accept its approach or its conclusion. We are unable to ignore the plain implication of Daitom's reservation in its boilerplate warranties provision of all its rights and remedies available at law. Such an explicit reservation impliedly reserves the statutory period of limitations; without such a reservation, all other reservations of actions and remedies are without effect.

The statutory period of limitations under the U.C.C. is four years after the cause of action has accrued. U.C.C. § 2–725(1). Were we to determine that this four-year period became a part of the contract rather than the shorter one-year period, Daitom's actions on breach of warranties were timely brought and summary judgment against Daitom was error.[5]

We realize that our conclusion requires an inference to be drawn from a construction of Daitom's terms; however, such an inference and construction are consistent with the judicial reluctance to grant summary judgment where there is some reasonable doubt over the existence of a genuine material fact. *See Williams v. Borden, Inc.*, 637 F.2d 731, 738 (10th Cir.1980).

---

**5.** Daitom filed its complaint on March 7, 1980. While the parties dispute when the cause of action accrued and the period of limitations began to run, resolution of the dispute is unnecessary if this court concludes the four-year limi-tations period controls. Even if it is found the action accrued in May 1977 on delivery of the dryers to Daitom's plant, the four-year period of limitations had not expired on March 7, 1980 when the complaint was filed.

When taking into account the circumstances surrounding the application of the one-year limitations period, we have little hesitation in adopting the U.C.C.'s four-year limitations reservation, the application of which permits a trial on the merits. Thus, this court must recognize that certain terms in Daitom's acceptance differed from terms in Pennwalt's offer and decide which become part of the contract. The district court certainly erred in refusing to recognize such a conflict.[6]

The difficulty in determining the effect of different terms in the acceptance is the imprecision of drafting evident in § 2–207. The language of the provision is silent on how different terms in the acceptance are to be treated once a contract is formed pursuant to § 2–207(1). That section provides that a contract may be formed by exchanged writings despite the existence of additional or different terms in the acceptance. Therefore, an offeree's response is treated as an acceptance while it may differ substantially from the offer. This section of the provision, then, reformed the mirror-image rule; that common law legal formality that prohibited the formation of a contract if the exchanged writings of offer and acceptance differed in any term.

Once a contract is recognized pursuant to § 2–207(1), 2–207(2) provides the standard for determining if the additional terms stated in the acceptance become a part of the contract. Between merchants, such *additional* terms become part of the resulting contract *unless* 1) the offer expressly limited acceptance to its terms, 2) the additional terms materially alter the contract obligations, or 3) the offeror gives notice of his or her objection to the additional terms within a reasonable time. Should any one of these three possibilities occur, the *additional* terms are treated merely as proposals for incorporation in the contract and absent assent by the offeror the terms of the offer control. In any event, the existence of the additional terms does not prevent a contract from being formed.

■ Section 2–207(2) is silent on the treatment of terms stated in the acceptance that are *different*, rather than merely additional, from those stated in the offer. It is unclear whether "different" terms in the acceptance are intended to be included under the aegis of "additional" terms in § 2–207(2) and, therefore, fail to become part of the agreement if they materially alter the contract. Comment 3 suggests just such an inclusion.[7] However, Comment 6 suggests that different terms in exchanged writings must be assumed to constitute mutual objections by each party to the other's conflicting terms and result in a mutual "knockout" of both parties' conflicting terms; the missing terms to be supplied by the U.C.C.'s "gap-filler" provisions.[8] At least one commentator, in support of this view, has suggested that the drafting history of the provision indicates that the word "different" was intentionally deleted from the final draft of § 2–207(2) to

---

**6.** There is some indication in its memorandum and order that had the district court considered the effect of the conflicting terms, it would have applied § 2–207(2)(b) and concluded that the terms in Pennwalt's offer controlled because Daitom's conflicting terms would have materially altered the content. Memorandum and Order at 11. Because we hold, *infra*, that conflicting terms should not be analyzed pursuant to § 2–207(2), this conclusion of the district court is also in error.

**7.** Comment 3 states (emphasis added):
Whether or not *additional or different* terms will become part of the agreement depends upon the provision of subsection (2).
It must be remembered that even official comments to enacted statutory text do not have

the force of law and are only guidance in the interpretation of that text. *In re Bristol Associates, Inc.,* 505 F.2d 1056 (3rd Cir.1974) (while the comments to the Pennsylvania U.C.C. are not binding, the Pennsylvania Supreme Court gives substantial weight to the comments as evidencing application of the Code).

**8.** Comment 6 states, in part:
Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself * * *. The contract then consists of the terms expressly agreed to, terms on which the confirmations agree, and terms supplied by the Act, including subsection (2).

preclude its treatment under that subsection.[9] The plain language, comments, and drafting history of the provision, therefore, provide little helpful guidance in resolving the disagreement over the treatment of different terms pursuant to § 2–207.

Despite all this, the cases and commentators have suggested three possible approaches. The first of these is to treat "different" terms as included under the aegis of "additional" terms in § 2–207(2). Consequently, different terms in the acceptance would never become part of the contract, because, by definition, they would materially alter the contract (i.e., the offeror's terms). Several courts have adopted this approach. *E.g., Mead Corporation v. McNally-Pittsburg Manufacturing Corporation*, 654 F.2d 1197 (6th Cir.1981) (applying Ohio law); *Steiner v. Mobil Oil Corporation*, 20 Cal.3d 90, 141 Cal.Rptr. 157, 569 P.2d 751 (1977); *Lockheed Electronics Company, Inc. v. Keronix, Inc.*, 114 Cal. App.3d 304, 170 Cal.Rptr. 591 (1981).

The second approach, which leads to the same result as the first, is that the offeror's terms control because the offeree's different terms merely fall out; § 2–207(2) cannot rescue the different terms since that subsection applies only to *additional* terms. Under this approach, Comment 6 (apparently supporting a mutual rather than a single term knockout) is not applicable because it refers only to conflicting terms in confirmation forms following *oral* agreement, not conflicting terms in the *writings* that form the agreement. This approach is supported by Professor Summers. J.J. White & R.S. Summers, *Uniform Commercial Code*, § 1–2, at 29 (2d ed. 1980).

The third, and preferable approach, which is commonly called the "knock-out" rule, is that the conflicting terms cancel one another. Under this view the offeree's form is treated only as an acceptance of the terms in the offeror's form which did not conflict. The ultimate contract, then,

includes those non-conflicting terms and any other terms supplied by the U.C.C., including terms incorporated by course of performance (§ 2–208), course of dealing (§ 1–205), usage of trade (§ 1–205), and other "gap fillers" or "off-the-rack" terms (e.g., implied warranty of fitness for particular purpose, § 2–315). As stated previously, this approach finds some support in Comment 6. Professor White supports this approach as the most fair and consistent with the purposes of § 2–207. *White & Summers, supra*, at 29. Further, several courts have adopted or recognized the approach. *E.g., Idaho Power Company v. Westinghouse Electric Corporation*, 596 F.2d 924 (9th Cir.1979) (applying Idaho law, although incorrectly, applying § 2–207(3) after finding a contract under § 2–207(1)); *Owens-Corning Fiberglass Corporation v. Sonic Development Corporation*, 546 F.Supp. 533 (D.Kan.1982) (Judge Saffels applying Kansas law); *Lea Tai Textile Co., Ltd. v. Manning Fabrics, Inc.*, 411 F.Supp. 1404 (S.D.N.Y.1975); *Hartwig Farms, Inc. v. Pacific Gamble Robinson Company*, 28 Wash.App. 539, 625 P.2d 171 (1981); *S.C. Gray, Inc. v. Ford Motor Company*, 92 Mich.App. 789, 286 N.W.2d 34 (1979).

We are of the opinion that this is the more reasonable approach, particularly when dealing with a case such as this where from the beginning the offeror's specified period of limitations would expire before the equipment was even installed. The approaches other than the "knock-out" approach would be inequitable and unjust because they invited the very kind of treatment which the defendant attempted to provide.

■ Thus, we are of the conclusion that if faced with this issue the Pennsylvania Supreme Court would adopt the "knock-out" rule and hold here that the conflicting terms in Pennwalt's offer and Daitom's acceptance regarding the period of limitations and applicable warranties cancel one another out. Consequently, the other pro-

---

**9.** See D.G. Baird & R. Weisberg, *Rules, Standards, and the Battle of the Forms: A Reassess-* *ment of § 2–207*, 68 Va.L.R. 1217, 1240, n. 61.

visions of the U.C.C. must be used to provide the missing terms.

This particular approach and result are supported persuasively by the underlying rationale and purpose behind the adoption of § 2–207. As stated previously, that provision was drafted to reform the infamous common law mirror-image rule and associated last-shot doctrine that enshrined the fortuitous positions of senders of forms and accorded undue advantages based on such fortuitous positions. *White & Summers, supra* at 25. To refuse to adopt the "knock-out" rule and instead adopt one of the remaining two approaches would serve to re-enshrine the undue advantages derived solely from the fortuitous positions of when a party sent a form. Cf., 3 Duesenberg & King at 93 (1983 Supp.). This is because either approach other than the knock-out rule for different terms results in the offeror and his or her terms always prevailing solely because he or she sent the first form. Professor Summers argues that this advantage is not wholly unearned, because the offeree has an opportunity to review the offer, identify the conflicting terms and make his or her acceptance conditional. But this joinder misses the fundamental purpose of the U.C.C. in general and § 2–207 in particular, which is to preserve a contract and fill in any gaps if the parties intended to make a contract and there is a reasonable basis for giving an appropriate remedy. U.C.C. §§ 2–204(3); § 2–207(1); § 2–207(3). Thus, this approach gives the offeree some protection. While it is laudible for business persons to read the fine print and boilerplate provisions in exchanged forms, there is nothing in § 2–207 mandating such careful consideration. The provision seems drafted with a recognition of the reality that merchants seldom review exchanged forms with the scrutiny of lawyers. The "knock-out" rule is therefore the best approach. Even if a term eliminated by operation of the "knock-out" rule is reintroduced by operation of the U.C.C.'s gap-filler provisions, such a result does not indicate a weakness of the approach. On the contrary, at least the reintroduced term has the merit of being a term that the U.C.C. draftpersons regarded as fair.

We now address the question of reverse and remand regarding Counts I and II. The result of this court's holding is that the district court erred in granting summary judgment against Daitom on Counts I and II of its complaint. Operation of the "knock-out" rule to conflicting terms results in the instant case in the conflicting terms in the offer and acceptance regarding the period of limitations and applicable warranties cancelling. In the absence of any evidence of course of performance, course of dealing, or usage of trade providing the missing terms, §§ 2–725(1), 2–313, 2–314, 2–315 may operate to supply a four-year period of limitations, an express warranty,[10] an implied warranty of merchantability, and an implied warranty of fitness for a particular purpose, respectively. The ruling of the district court on Counts I and II does not invite this kind of a broad inquiry, and thus, we must recognize the superiority in terms of justice of the "knock-out" rule. Consequently, the ruling of the district court on Counts I and II must be reversed and the matter remanded for trial consistent with this court's ruling.

### D. *Unavailability of tort remedy*

The district court correctly granted summary judgment against Daitom on Count III. It held that there is no cause of action in tort for a purely economic loss. In Count III of its complaint, Daitom sought damages resulting from the failure of the rotary dryers, alleging negligent design and manufacture. After holding, pursuant to § 2–207(2)(b), that the terms of Pennwalt's offer limiting warranties to repair and replacement controlled over the conflicting terms of Daitom's acceptance reserving all available warranties, the district court further held that the contractual limitation of warranties could not be avoided

---

**10.** Daitom alleges that several letters from Pennwalt expressly warrantied the performance of the rotary dryers. *E.g.,* Pretrial Order, Record Volume II at 59, para. 12, 13, 14, 15.

by an action in tort. The district court apparently considered itself applying the law of Pennsylvania and explicitly adopted the reasoning of the federal district court in *Woodard v. Republic Powdered Metals, Inc.,* No. 74–127–C5 (D.Kan., unpublished 9/22/77). The district court concluded that "pure economic loss" was not recoverable in tort.

Daitom contends that the district court erred, because Daitom seeks damages not solely for "pure economic loss", but also for physical damage to its property, including the concrete pad on which the dryers were mounted and the associated piping and connecting equipment. Daitom relies principally on the recent decision of *Fordyce Concrete, Inc. v. Mack Trucks, Inc.,* 535 F.Supp. 118 (D.Kan.1982) (applying Kansas law) which permitted the buyer to recover under the theory of strict liability in tort for damages to the cab of a truck which resulted from the breaking of the frame of the chassis purchased from a truck manufacturer. Once physical damage to property is established, Daitom argues, pecuniary or economic loss may also be recovered.

 In the abstract, the district court apparently considered Pennsylvania law to provide the rules of decision on this issue, while the court adopted the reasoning of *Woodard, supra,* applying Kansas law. Moreover, the parties cite numerous Kansas state court decisions. While a federal court sitting in diversity applies the conflicts laws of the state in which it is sitting (*Klaxon v. Stentor Electric Manufacturing Company, Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)), this court has no evidence that the laws of Kansas and Pennsylvania differ on this issue; the law of both jurisdictions deny tort recovery for the damages claimed by Daitom. In accordance with these decisions, we must hold that an action for damages from a product's qualitative defects alone without proof of the product's dangerousness cannot sound in tort.

*Fordyce, supra,* is the recent relevant decision on the present issue. However, it cannot properly be read, as Daitom urges, to authorize tort recovery under the circumstances of the instant case. *Fordyce* merely held that plaintiff could recover for physical damage to property resulting from an unreasonably dangerous defective product, irrespective of whether the damage was inflicted upon the defective product itself or upon other property. *Fordyce, supra,* at 126. From an analysis of the other decisions, unreasonable dangerousness consistently appears as a prerequisite and touchstone to recovery in tort for damages caused by a defective product. *See* Restatement (Second) of Torts § 395 (Negligent Manufacture of Chattel Dangerous Unless Carefully Made), § 402(A), (Special [strict] Liability of Seller Product for Physical Harm to User or Consumer).

The seminal case in this area is *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965). There the California Supreme Court held that "economic loss" caused by "qualitative defects" cannot be recovered in tort. A qualitative defect is merely a defect that precludes the product from being fit for its intended use or functioning as expected for the purpose it was designed. *Id.* 45 Cal.Rptr. at 23, 403 P.2d at 151; *Pennsylvania Glass Sand Corporation v. Caterpillar Tractor Company,* 652 F.2d 1165, 1173 (3rd Cir.1981). Courts in most states have followed *Seely,* rather than the contrary dicta in *Santor v. A & M. Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965), which declared that plaintiff possessed a cause of action for strict liability in tort for damages caused by an unsatisfactory product. *See Pennsylvania Glass Sand, supra* at 1171 n. 17 (listing decisions following *Seely* ); *Jones & Laughlin Steel Corporation v. Johns-Manville Sales Corporation,* 626 F.2d 280, 287 n. 13 (3d Cir.1980). This court likewise declares that both Kansas and Pennsylvania have adopted the rule articulated in *Seely.*

In drawing the distinction between damages resulting from defective products properly recoverable in both tort and contract and those recoverable solely in con-

tract, the designations of physical damages for the former and economic loss for the latter ought to be eliminated. Neither designation supplies a workable talisman. Instead, as numerous courts have stated:

> [T]he line between tort and contract must be drawn by analyzing interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. These factors bear directly on whether the safety-insurance policy of tort law or the expectation-bargain protection policy of warranty law is most applicable to a particular claim.

*Pennsylvania Glass Sand, supra* at 1173.

Applying this standard, it is only when the nature of the defect, the type of risk, and the manner of injury derive from the unreasonable dangerousness of the product that tort recovery can be pursued. This is consistent with the relative policies underlying the law of warranties and the law of torts.

The law of products liability in tort, either based on negligence or strict liability, has been adopted for cases involving injury to persons or property from dangerously defective products in order to place the costs of such injuries on the manufacturer—the party best able to absorb or distribute the cost. *Jones & Laughlin Steel, supra* at 288. Because the defective product may injure persons or property of persons who have not dealt with the manufacturer directly, there is no price mechanism to insure such persons against such injury. Consequently, the product's true costs, including the cost of the risk of defects and injury, cannot be internalized in the price of the product. The imposition of manufacturer's products liability for dangerous, defect products accomplishes this cost internalization that the price mechanism itself cannot achieve. The manufacturer may then, in turn, allocate a portion of these costs to the purchasers in the form of higher prices; however, the manufacturer maintains a duty to provide a safe product.

In contrast, there is no need to impose a non-contractual duty to provide a product of high quality fit to perform its functions, because there is no danger of injury to persons other than the purchaser of the product through the product's poor performance. *Id.* at 289. Consequently, there is no need to internalize the costs of possible loss through a non-price mechanism such as products liability. The buyer may protect himself or herself against the risk of poor performance by bargaining for a warranty. The extension of products liability to these types of losses would make the manufacturer the guarantor that its products would continue to perform satisfactory throughout their productive lives. This is plainly against the purpose of either current manufacturer's products liability or contract law.

■ Here there is no evidence that the dryers posed an unreasonable danger to persons or property. Instead, Daitom merely contended throughout this action that the dryers suffered from qualitative defects that rendered them unsuitable for their intended purpose and not of "fair and average quality." *See, e.g.,* Daitom's Complaint, Count I, paras. 7, 8, Record, Volume I at 2; Count II, paras. 12, 14, Volume I at 2–3; Pretrial Order, paras. 5, 6, Volume II at 166.

Accordingly, the district court correctly concluded that Daitom's requested damages are not recoverable in tort. The court's summary judgment ruling against Daitom on Count III, therefore, should be affirmed. As explained above, we reverse the trial court with respect to Counts I and II. The cause is remanded for further proceedings consistent with this opinion.

BARRETT, Circuit Judge, dissenting:

I respectfully dissent. Insofar as the issue of contract formation is concerned in this case, we are confronted with a "battle of the forms" case involving the interpretation and application of U.C.C. § 2–207. I would affirm.

Pennwalt's proposal of September 7, 1976, was an "offer." It was submitted to Daitom in response to solicitations initiated by Daitom and it contained specific terms

relating to price, delivery dates, etc., and its terms were held "open" for Daitom's acceptance within 30 days. In my view, Daitom accepted the offer with its purchase order. That order repeated the quantity, model number, and price for the items as those terms appeared in the Pennwalt proposal and, by reference, it incorporated four pages of specifications attached to Pennwalt's proposal or "offer." The purchase order did contain some different and additional language from that contained in Pennwalt's proposal. However, the Code has rejected the old mirror image rule. Thus, I agree with the district court's finding/ruling that a contract was formed in the circumstances described.

I also agree with the district court's conclusion that the terms of Pennwalt's proposal constituted the "terms of the contract." I do not agree, as Daitom argues, that its "acceptance" was made "conditional" upon Pennwalt's assent to the additional/different terms set forth in Daitom's purchase order. The court correctly found no such *express* condition in Daitom's acceptance.

The "knock-out" rule should not, in my view, be reached in this case. It can be applied only if, as Daitom argues and the majority agrees, the "conflicting terms" cancel each other out. The "knock-out" rule does have substantial support in the law, but I do not believe it is relevant in this case because the *only* conflicting terms relate to the *scope* of the warranty. In this case, it is not an important consideration because, pursuant to the express time limitations contained in Pennwalt's "offer," Daitom lost its right to assert any warranty claim. There was no term in Daitom's purchase order in conflict with the express one-year limitation within which to bring warranty actions. I agree with the district court's reasoning in rejecting Daitom's contentions that the one-year limitation period should not apply because (1) the term failed of "its essential purpose" of providing Daitom with a limited remedy under U.C.C. § 2–719(2) and (2) the time-limit was tolled due to Pennwalt's alleged fraudulent concealment of the defect. I concur with the trial court's finding that Daitom made no showing that the one-year limitation period was unreasonable because of some act of Pennwalt. As to the fraudulent concealment allegation, the court properly observed that Daitom did not plead this claim with the particularity required and, further, that the alleged fraudulent acts were not independent of the alleged breaches proper.